**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

**CASE NO. 6:15-MN-02613-BHH**

| | |
|---|---|
| **IN RE:  TD BANK, N.A. DEBIT CARD OVERDRAFT FEE LITIGATION**<br><br>**MDL No. 2613** | **ALL CASES** |

**RESPONSE IN OPPOSITION TO DEFENDANT TD BANK, N.A.'S
MOTION TO DISMISS COUNTS I-VI AND VIII OF PLAINTIFFS'
CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

E. Adam Webb
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, SE, Suite 480
Atlanta, GA 30339
Telephone: (770) 444-0773
Adam@WebbLLC.com

Richard D. McCune
**McCUNEWRIGHT LLP**
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
Telephone: (909) 557-1250
rdm@mccunewright.com

*Co-Lead Counsel for Plaintiffs*

Mark C. Tanenbaum
**LAW OFFICE OF MARK C. TANENBAUM**
120 Church Street
Charleston, SC 29413
Telephone: (843) 577-5100
mark@tanenbaumlaw.com

William E. Hopkins, Jr.
**HOPKINS LAW FIRM, LLC**
12019 Ocean Highway
Pawleys Island, SC 29585
Telephone: (843) 314-4202
bill@hopkinslawfirm.com

*Liaison Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

I.      Standard of Review ................................................................................... 1

II.     Factual Background ................................................................................... 1

        A.      TD's Self-Serving Factual Summaries Should Be Ignored. ................. 1

        B.      TD Bank's Overdraft Policies Are Not Disclosed in the Bank's
                Personal Deposit Account Agreement ................................................. 2

                1.      The PDAA States That Overdraft Fees Are Not Charged on
                        "Pending" Authorizations ........................................................ 2

                2.      The PDAA Fails to State That Debits Are Posted From
                        Highest to Lowest Dollar Amount ........................................... 4

                3.      The PDAA Fails to State That TD Bank Will Assess
                        Overdraft Fees on Debit Card Transactions That Overdraw
                        the Account ............................................................................. 5

                4.      The PDAA's Charges on Sustained Overdrafts Are
                        Usurious ................................................................................. 6

III.    Prior Proceedings ..................................................................................... 7

        A.      MDL 2036 ........................................................................................ 7

        B.      *Hughes v. TD Bank* ......................................................................... 8

        C.      *King v. TD Bank* ............................................................................ 8

IV.     Argument and Citation of Authorities ....................................................... 9

        A.      Plaintiffs' Claims Are Not Preempted by Federal Law ....................... 9

                1.      TD Bank Cannot Meet Its Heavy Burden of Proving
                        Preemption ........................................................................... 10

                2.      *Gutierrez* and Other Inapposite Authorities Do Not Vary
                        the Result ............................................................................. 14

i

B.     Plaintiffs Have Valid State Law Claims ...................................................19

    1.    Plaintiffs Bring a Valid Breach of Contract Claim...................................20

        a.    The PDAA Does Not Authorize TD Bank to Assess Overdraft Fees on a Customer's "Available Balance"....................................................................................21

        b.    The PDAA Fails to Clearly and Unambiguously State That TD Bank Posts Items in High-to-Low Order ...............................................................................24

        c.    The PDAA Provides That Overdraft Fees Will Not be Assessed on Debit Card Transactions.......................................25

    2.    Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith Is Properly Alleged ..................................................26

    3.    Plaintiffs State a Valid Claim for Unjust Enrichment .............................29

    4.    Plaintiffs Have a Valid Claim for Conversion ..........................................30

    5.    Unconscionability ......................................................................................31

    6.    Plaintiffs State Valid Claims for Applicable Unfair Trade Practices ....................................................................................................31

        a.    TD's Overdraft Practices Were Not Authorized by Law ............................................................................................32

        b.    Plaintiffs State a Claim Under New Jersey's Consumer Fraud Act ...................................................................35

        c.    The CAC States a Claim Under Connecticut Law........................38

        d.    The CAC States a Claim Under New York Law .........................39

        e.    The CAC States Claims Under Other State Statutes ....................40

C.     Plaintiffs State A Valid Usury Claim Under Section 85 of the NBA...................43

V.    Conclusion ............................................................................................................50

CERTIFICATE OF SERVICE .................................................................................52

## TABLE OF AUTHORITIES

*Armstrong v. Colonial Bank, N.A.*,
    196 Fed. App'x 872 (11th Cir. 2006) ...............................................................49

*Astarte Shipping Co. v. Allied Steel & Export Serv.*,
    767 F.2d 86 (5th Cir. 1985) ...............................................................................8, 9

*Auguston v. Spry*,
    282 A.D.2d 489 (2001) ..........................................................................................29

*Baldanzi v. WFC Holdings Corp.*,
    2008 WL 4924987 (S.D.N.Y. Nov. 14, 2008) ...........................................11, 33

*Baltimore & Ohio R.R. v. Equitable Bank*,
    550 A.2d 407 (Md. Ct. Spec. App. 1988) .........................................................30

*Baptista v. JPMorgan Chase Bank, N.A.*,
    640 F.3d 1194 (11th Cir. 2011) ................................................................16, 18

*Barnett Bank of Marion County, N.A. v. Nelson*,
    517 U.S. 25 (1996)..........................................................................................11, 19

*BMC Indus., Inc. v. Barth Indus., Inc.*,
    160 F.3d 1322 (11th Cir. 1998) .........................................................................50

*Bosland v. Warnock Dodge, Inc.*,
    964 A.2d 741 (N.J. 2009) ....................................................................................37

*Bumpers v. Community Bank of N. Va.*,
    747 S.E.2d 220 (N.C. 2013)................................................................................43

*Cargile v. JP Morgan Chase & Co.*,
    2010 WL 5491200 (E.D. Mich. 2010) ...............................................47, 48, 49

*Chan v. Thompson*,
    395 S.E.2d 731 (S.C. Ct. App. 1990) ...............................................................20

*Channelbind Int'l Corp. v. Esselte Corp.*,
    2009 WL 3617611 (D.S.C. Oct. 29, 2009) .....................................................30

*Chase Home Fin., LLC v. Risher*,
    746 S.E.2d 471 (S.C. Ct. App. 2013) ...............................................................29

*Chestnut v. Am. Gen. Life Ins. Co.*,
    2013 WL 314758 (D.S.C. Jan. 28, 2013) .......................................................27

*Commercial Credit Corp. v. Nelson Motors, Inc.*,
    147 S.E.2d 481 (S.C. 1966) ...............................................................................27

*Conner v. City of Forest Acres*,
    560 S.E.2d 606 (S.C. 2002) ........................................................27

*Cox v. Sears Roebuck & Co.*,
    647 A.2d 454 (N.J. 1994) ........................................................36

*Cuomo v. Clearing House Ass'n, LLC*,
    557 U.S. 519 (2009) ........................................................11

*D'Agostino v. Maldonado*,
    78 A.3d 527 (N.J. 2013) ........................................................36

*Dalton v. Camp*,
    548 S.E.2d 704 (N.C. 2001) ........................................................43

*DeAngelis v. Timberpeg E., Inc.*
    51 A.D.3d 1175 (N.Y. App. Div. 2008) ........................................................39

*Decohen v. Capital One, N.A.*,
    703 F.3d 216 (4th Cir. 2012) ........................................................11

*DeGulis v. LXR Biotechnology, Inc.*,
    928 F. Supp. 1301 (S.D.N.Y. 1996) ........................................................10

*Dept. of Natural Resources v. McClellanville*,
    550 S.E.2d 299 (S.C. 2001) ........................................................20

*Devitt v. Manulik*,
    410 A.2d 465 (Conn. 1979) ........................................................30

*Dorset Indus., Inc. v. Unified Grocers*,
    893 F. Supp. 2d 395 (E.D.N.Y. 2012) ........................................................27

*Edwards v. N. Am. Power and Gas, LLC*,
    2015 WL 4644597 (D. Conn. Aug. 4, 2015) ........................................................38

*Edwards v. William H. Porter, Inc.*,
    1991 Del. Super. LEXIS 315 (Del. Super. Ct. July 26, 1991) ........................................................40, 41

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) ........................................................1, 2

*Elijah Mount v. Executors of W.W. Cubberly*,
    19 N.J.L. 124 (1842) ........................................................30

*Epps v. JPMorgan Chase Bank, N.A.*,
    675 F.3d 315 (4th Cir. 2012) ........................................................11

*Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*,
    4 F.3d 90 (1st Cir. 1993) ...................................................................30

*Fellner v. Tri-Union Seafoods, LLC*,
    539 F.3d 237 (3d Cir. 2008) ..............................................................34

*Fifth Third Bank v. CSX Corp.*,
    415 F.3d 741 (7th Cir. 2005) .............................................................10

*First Dakota Nat'l Bank v. First Nat'l Bank of Plainview*,
    2011 WL 4382147 (D.S.D. Sept. 19, 2011) ..............................48, 49

*Francis v. Giacomelli*,
    588 F.3d 186 (4th Cir. 2009) ...............................................................1

*Fuller v. E. Fire & Cas. Ins. Co.*,
    124 S.E.2d 602 (S.C. 1962) ..............................................................20

*Gilliland v. Elmwood Props.*,
    391 S.E.2d 577 (S.C. 1990) ..............................................................25

*Gott v. Phillips*,
    517 A.2d 328 (Md. 1986) ..................................................................42

*Gray v. N.C. Ins. Underwriting Ass'n*,
    529 S.E. 2d 676 (N.C. 2000)............................................................43

*Great W. Res., LLC v. Bank of Ark., N.A.*,
    2006 WL 626375 (W.D. Ark. Mar. 13, 2006) .........................11, 33

*Griner v. Synovus Bank*,
    818 F. Supp. 2d 1338 (N.D. Ga. 2011) ............................................19

*Gutierrez v. Wells Fargo Bank, N.A.*,
    704 F.3d 712 (9th Cir. 2012) .............................................14, 15, 18, 33

*Gutierrez v. Wells Fargo Bank, N.A.*,
    944 F. Supp. 2d 819 (N.D. Cal. 2013) ..............................................15

*Gutierrez v. Wells Fargo Bank, N.A.*,
    589 Fed. App'x 824 (9th Cir. 2014) .................................................15

*Hanjy v. Arvest Bank*,
    __ F. Supp. 3d __, 2015 WL 1456186 (E.D. Ark. Mar. 31, 2015) ......................12, 29, 31

*Harsch Props., Inc. v. Nicholas*,
    182 Vt. 196 (2007) ............................................................................27

*Hassler v. Sovereign Bank*,
    644 F. Supp. 2d 509 (D.N.J. 2009) ...................................................8, 28, 34

*Hassler v. Sovereign Bank*,
    374 Fed. App'x 341 (3d Cir. 2010) .................................................8, 28, 34

*Higgins v. Pinnacle Fin. Partners, Inc.*,
    Case No. 11-C4858 (Tenn. 5th Cir. Ct. May 16, 2012) ............................12, 13

*Hinchliffe v. Am. Motors Corp.*,
    440 A.2d 810 (Conn. 1981) ...................................................................35, 39

*Hobgood v. Pennington*,
    387 S.E.2d 690 (S.C. Ct. App. 1989) .........................................................21

*Hollis v. Ameriquest Mort. Co.*,
    2009 WL 3030125 (D.N.J. Bankr. Sept. 17, 2009) ......................................33

*Hughes v. TD Bank, N.A.*,
    856 F. Supp. 2d 673 (D.N.J. 2012) ..................................................... *passim*

*Iberia Credit Bureau, Inc. v. Cingular Wireless*,
    668 F. Supp. 2d 831 (W.D. La. 2009) ........................................................10

*In re Auto. Parts Antitrust Litig.*,
    2013 U.S. Dist. LEXIS 80338 (E.D. Mich. June 6, 2013) .............................42

*In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*,
    2009 WL 4063349 (N.D. Cal. Nov. 20, 2009) .............................................11

*In re Checking Account Overdraft Litig.*,
    797 F. Supp. 2d 1312 (S.D. Fla. 2011) ......................................................12

*In re Checking Account Overdraft Litig.*,
    694 F. Supp. 2d 1302 (S.D. Fla. 2010) ............................................... *passim*

*In re Frigitemp Corp.*,
    34 B.R. 1000 (S.D.N.Y. 1983) ...................................................................49

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
    1 F. Supp. 3d 34 (E.D.N.Y. 2014) ..................................................... *passim*

*In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*,
    14 F. Supp. 3d. 99 (E.D.N.Y. 2014) ..........................................................12

*In re Nat'l Credit Mgmt. Group, LLC*,
    21 F. Supp. 2d 424 (D.N.J. 1998) ..............................................................34

*In re Ocwen Loan Servicing, LLC,*
    491 F.3d 638 (7th Cir. 2007) .......................................................15

*In re Optical Disk Drive Antitrust Litig.,*
    2012 WL 1366718 (N.D. Cal. Apr. 19, 2012) ..................................41

*In re TD Bank Debit Card Overdraft Fee Litig.,*
    2015 WL 1519035 (J.P.M.L. Apr. 2, 2015) ....................................9

*In re Terrorist Attacks on Sept. 11, 2011,*
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ...........................................10

*In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.,*
    64 F.2d 114 (6th Cir. 1981) .....................................................9, 10

*In re Wash. Mut. Overdraft Prot. Litig.,*
    2004 WL 5046210 (C.D. Cal. Apr. 26, 2004) ..................................49

*Jackson v. U.S. Bank, N.A.,*
    44 F. Supp. 3d 1210 (S.D. Fla. 2014) ..........................................14

*Jefferson v. Chase Home Fin.,*
    2008 WL 1883484 (N.D. Cal. Apr. 29, 2008) ..................................33

*Johnson v. Advance Am.,*
    549 F.3d 932 (4th Cir. 2008) ...................................................1, 2

*King v. TD Bank, N.A.,*
    26 F. Supp. 3d 510 (D.S.C. 2014) ...................................... *passim*

*Leon v. Rite Aid Corp.,*
    774 A.2d 674 (N.J. App. Div. 2001) ...........................................36

*Levin v. HSBC Bank USA, N.A.,*
    2012 WL 7964121 (N.Y. Sup. June 26, 2012) ................................33

*Lewis v. BT Inv. Managers, Inc.,*
    447 U.S. 27 (1980) ...............................................................19

*Lewis v. Omni Indem. Co.,*
    2013 WL 4823401 (D.S.C. Sept. 9, 2013) ....................................20

*Mann v. TD Bank, N.A.,*
    2010 WL 4226526 (D.N.J. Oct. 20, 2010) ....................................37

*Mann v. TD Bank, N.A.,*
    2009 WL 3818128 (D.N.J. Nov. 12, 2009) ....................................34

vii

*Mamot Feed Lot and Trucking v. Hobson*,
   539 F.3d 898 (8th Cir. 2008) ........................................................................19

*Martinez v. Wells Fargo Home Mort., Inc.*,
   598 F.3d 549 (9th Cir. 2010) .......................................................................33

*McGee v. Bank of Am., N.A.*,
   2015 U.S. Dist. LEXIS 99626 (S.D. Fla. July 30, 2015) ...............................49

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .....................................................................................10

*Mickens v. Ford Motor Co.*,
   900 F. Supp. 2d 427 (D.N.J. 2012) ..............................................................36

*MLEA, Inc. v. Atl. Recycled Rubber, Inc.*,
   2005 WL 1217190 (E.D. Pa. May 19, 2005) .................................................29

*Monroe Retail, Inc. v. RBS Citizens, N.A.*,
   589 F.3d 274 (6th Cir. 2009) .......................................................................18

*Montgomery v. Bank of Am. Corp.*,
   515 F. Supp. 2d 1106 (C.D. Cal. 2007) ........................................................19

*Moore v. Weinberg*,
   644 S.E.2d 740 (S.C. Ct. App. 2007) ...........................................................30

*MRA Prop. Mgmt., Inc. v. Armstrong*,
   43 A.3d 397 (Md. 2012) ...............................................................................42

*Mulligan v. Choice Mortg. Corp. USA*,
   1998 U.S. Dist. LEXIS 13248 (D.N.H. Aug. 11, 1998) ................................35

*Mwantembe v. TD Bank, N.A.*,
   669 F. Supp. 2d 545 (E.D. Pa. 2009) ...........................................................12

*Naples v. Keystone Bldg. & Dev. Corp.*,
   990 A.2d 326 (Conn. 2010) ..........................................................................38

*Norman German's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*,
   558 A.2d 1066 (Del. Super. Ct. 1989) .........................................................40

*Norman German's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*,
   596 A.2d 1358 (Del. 1991) ...........................................................................40

*Nicolas v. Deposit Guar. Nat'l Bank*,
   182 F.R.D. 226 (S.D. Miss. 1998) ...........................................................49, 50

*Occupy Columbia v. Haley*,
  922 F. Supp. 2d 524 (D.S.C. 2013) ............................................................1

*Old Nat'l Bank v. Kelly*,
  31 N.E.3d 522 (In. Ct. App. 2015) .......................................................12, 17

*Peckey v. Bank of Am., N.A.*,
  2015 U.S. Dist. LEXIS 47210 (D. Md. Apr. 10, 2015) ....................................42

*Pee Dee Stores, Inc. v. Doyle*,
  672 S.E.2d 799 (S.C. Ct. App. 2009) ........................................................20

*Pelman v. McDonald's Corp.*,
  237 F. Supp. 2d 512 (S.D.N.Y. 2003) .......................................................39

*Pierpoint v. Doing Business Under the Firm Name of Prince & Whitely*,
  182 N.E. 235 (N.Y. 1932)...................................................................30

*Pinney v. Nokia, Inc.*,
  402 F.3d 430 (4th Cir. 2005) ............................................................8, 9

*Poskin v. TD BankNorth, N.A.*,
  2009 WL 2981963 (W.D. Pa. Sept. 11, 2009) ................................................12

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ...............................................................1

*Regions Bank v. Wingard Props., Inc.*,
  715 S.E.2d 348 (S.C. Ct. App. 2011) ........................................................29

*Richardson v. Bank of America, N.A.*,
  643 S.E.2d 410 (N.C. Ct. App. 2007) ........................................................43

*Rikos v. Procter & Gamble Co.*,
  2015 WL 4978712 (6th Cir. Aug. 20, 2015) ..................................................43

*Roberts v. Am. Warranty Corp.*,
  514 A.2d 1132 (Del. Super. Ct. 1986) ...................................................40, 41

*Roberts* v. *Cowgill*,
  719 A.2d 668 (N.J. Super. 1998) ........................................................35, 37

*Ross v. Canada Life Assurance Co.*,
  1996 WL 182561 (E.D. Pa. Apr. 16, 1996) ...................................................27

*Rowan County Bd. of Educ. v. U.S. Gypsum Co.*,
  428 S.E. 2d 648 (N.C. 1992) ...............................................................43

*Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.*,
    2009 WL 3100963 (M.D. Pa. Sept. 23, 2009) .................................................30

*Scull v. Groover, Christie & Merritt, P.C.*,
    76 A.3d 1186 (Md. 2013) .................................................................................42

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ................................................................................41, 42

*Shelton v. Oscar Mayer Foods Corp.*,
    459 S.E.2d 851 (S.C. Ct. App. 1995) ..............................................................27

*Simmons v. Ciba-Geigy Corp.*,
    302 S.E.2d 17 (S.C. 1983) ...............................................................................21

*Soto v. Bank of Lancaster County*,
    2010 WL 1257666 (E.D. Pa. Mar. 30, 2010) ..................................................49

*S. Atl. Fin. Servs., Inc. v. Middleton*,
    590 S.E.2d 27 (S.C. 2003) ...............................................................................20

*Star Fruit Co. v. Eagle Lake Growers, Inc.*,
    33 So.2d 858 (Fla. 1948)..................................................................................30

*State v. Mullin*,
    225 N.W. 2d 305 (Iowa 1975) ........................................................................49

*Stutman v. Chem. Bank*,
    95 N.Y.2d 24 (2000) .......................................................................35, 39, 40

*Synovus Bank v. Griner*,
    739 S.E. 2d 504 (Ga. Ct. App. 2013) ..............................................................50

*Terrell v. Hancock Bank*,
    7 F. Supp. 2d 812 (S.D. Miss. 1998) ........................................................49, 50

*Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc.*,
    487 F.3d 89 (2d Cir. 2007) ..............................................................................27

*Trombley v. Bank of Am. Corp.*,
    715 F. Supp. 2d 290 (D.R.I. 2010) ..............................................................11, 33

*Varacallo v. Mass. Mut. Life Ins. Co.*,
    752 A.2d 807 (N.J. Super. 2000) .....................................................................35

*Video Trax, Inc. v. NationsBank, N.A.*,
    33 F. Supp. 2d 1041 (S.D. Fla. 1988) ........................................................48, 49

*Vidiaki, LLC v. Just Breakfast & Things!!!,*
    33 A.3d 848 (Conn. Ct. App. 2012) .......................................................................29, 30

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2009) .............................................................................................11, 14, 15

*White v. Wachovia Bank, N.A.,*
    563 F. Supp. 2d 1358 (N.D. Ga. 2008) .......................................................12, 13, 14, 30

*Wright v. Craft,*
    372 S.C. 1 (S.C. Ct. App. 2006) ..................................................................................35

*Young v. Wells Fargo & Co.,*
    671 F. Supp. 2d 1006 (S.D. Iowa 2009) .................................................................11, 12

Plaintiffs oppose dismissal of Counts I-VI and VIII of their Consolidated Amended Class Action Complaint ("CAC"). The motion by TD Bank, N.A. ("TD" or "Bank") essentially asks this Court to reverse Judge Cain's well-reasoned decision in *King v. TD Bank, N.A.*, 26 F. Supp. 3d 510 (D.S.C. 2014). The fact that this case is now an MDL does nothing to change Judge Cain's prior conclusions. For the reasons explained herein, TD's motion should be denied.

## I.    Standard of Review.

As this Court noted in *Occupy Columbia v. Haley*, 922 F. Supp. 2d 524, 526 (D.S.C. 2013), "[t]he Rule 12(b)(6) standard has often been expressed as precluding dismissal unless it is certain that the plaintiffs are not entitled to relief under any legal theory that plausibly could be suggested by the facts alleged." A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim "challenges the legal sufficiency of a complaint." *Francis v. Giacomelli,* 588 F.3d 186, 192 (4th Cir. 2009). As such, it does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992). Indeed, the court must accept as true all of the facts alleged in the plaintiff's complaint and construe all reasonable inferences in favor of the plaintiff. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).

## II.    Factual Background.
### A.    TD's Self-Serving Factual Summaries Should Be Ignored.

TD starts the factual background by attempting to summarize its policies governing checking accounts, including its provisions for overdrafts and the posting of transactions. *See* Motion, pp. 4-6. Respectfully, this Court should ignore TD's self-serving summary, which relies heavily on matters not addressed in Plaintiffs' CAC. At this stage of the proceeding, Plaintiffs' allegations control, not TD's revisionist interpretations of Plaintiffs' allegations. *E.g.*, *Johnson v. Advance Am.,* 549 F.3d 932, 937 (4th Cir. 2008) (holding that plaintiffs are masters of the

complaint); *E.I. du Pont de Nemours,* 637 F.3d at 440 (same).

**B.    TD Bank's Overdraft Policies Are Not Disclosed in the Bank's Personal Deposit Account Agreement.**

Not only are TD's policies regarding posting of transactions and assessment of overdraft fees intrinsically unfair, these practices also conflict with, and thus breach, TD's contracts.  The Personal Deposit Account Agreement ("PDAA" or "Agreement", Exhibit A to the CAC) is a contract of adhesion drafted by TD, and it is the contract that governs the relationship between customers and the Bank.  *See* CAC ¶ 108.  The PDAA includes provisions relating to debit card transactions, the potential manipulation of such transactions, and the overdraft fees that might result therefrom.  These provisions extend from page 11 to page 14 of the PDAA, and they *do not* authorize TD to assess overdraft fees under the circumstances alleged in the CAC.

**1.    The PDAA States That Overdraft Fees Are Not Charged on "Pending" Authorizations.**

The PDAA specifically addresses what constitutes an overdraft in a section entitled "Overdrafts" that defines an overdraft as an advance of funds by TD:

> An overdraft is an **advance of funds** greater than the amount that has become available in accordance with the Bank's Fund Availability Policy . . . . Overdrafts may include advances to cover a check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account.

CAC, Ex. A, p. 14 (emphasis added).

TD improperly calculates overdrafts by subtracting the customer's pending debits rather than just using the actual balance of funds.  *See* CAC ¶¶ 101-04.  "Available balance" is the actual balance minus "pending" transactions, which may not settle or be paid for several days (and may not settle for the authorized amount or at all).  *Id.* at ¶ 104.  An account's "actual balance" is the amount of money held in an account.  *Id.* at ¶ 102.

In response to the allegations in the CAC, TD maintains that the PDAA "expressly

2

discloses that TD assesses overdraft fees based on a customer's 'available balance'." *See* Motion, p. 7 (Dkt. No. 53-1).   However, the PDAA only contemplates the assessment of overdraft fees in the following circumstances:   "Overdraft fees may be assessed on items presented for payment that bring your Account into a negative balance, as well as any subsequent transactions presented for payment while the Account has a negative balance."  CAC, Ex. A, pp. 12-13.  This definition comports with a customer's common sense understanding:  that is, if the Bank is not "out of pocket" money to cover a transaction, then no fee can be assessed.

Despite this plain language, TD assesses overdraft fees in other instances.  *See* CAC ¶¶ 101-11.  Rather than assessing fees based on the "balance" as stated, TD has programmed its system to base fees on a customer's "available balance," which is a term of art defined by the Bank.  *Id.* at ¶ 104.  While TD does define "available balance" – essentially a customer's actual balance minus authorized debit card transactions – such calculation is only to be used to "determine the amount available to pay other items presented against your account."  *See* CAC, Ex. A, p. 12.  Finally, the PDAA states, and TD admits in its brief, (*see* Motion, p. 8), that "**[o]verdraft fees are not charged on 'pending' authorizations,** although they reduce your available balance."  *Id.* at 13 (emphasis added).  Taken as a whole, TD has promised its customers (under terms it drafted and presented on a "take-it-or-leave-it" basis) that it would assess overdraft fees only when there is a negative actual balance.

Furthermore, that the Bank may use "available balance" to determine whether a customer has enough money in their account to pay other items presented does not mean that TD may assess overdraft fees merely because a customer has an insufficient "available balance."  Basing overdraft fees on "available balance" violates the plain language of the PDAA, because the Agreement does not use the term "available balance" when determining whether an overdraft fee

can be assessed.  *See* CAC, Ex. A, pp. 12-13.  Instead, TD chose to use the term "balance."  *Id.*
TD has, therefore, violated its own contract in assessing millions of improper overdraft fees.

> **2.    The PDAA Fails to State That Debits Are Posted From Highest to Lowest Dollar Amount.**

To maximize overdraft revenue, TD has also manipulated and reordered debits from
highest to lowest.  *See* CAC ¶ 121.  The Bank has reordered debit card transactions for no reason
other than to increase the number of exorbitant overdraft fees.  *Id.*  Transactions involving debit
cards, including the withdrawal of cash from ATMs and POS transactions with vendors, are
processed electronically.  *Id.* at ¶ 123.  As a result, TD is notified instantaneously when the
customer's debit card is swiped, and has the option to accept or decline these transactions.  *Id.*

TD often posts debit card transactions that have accumulated over multiple days.  *Id.* at ¶
126.  It posts all of the amassed charges on a single date.  *Id.*  When the group of transactions is
eventually posted to the customer's account, they are posted in order of largest to smallest – not
in the order in which they were received or in the order in which they were charged.  *Id.*  This
delayed posting results in the imposition of multiple overdraft fees that would not otherwise be
imposed.  *Id.*  TD does so to maximize the number of overdraft transactions and fees.  *Id.* at ¶
128.  These processing practices substantially increase the likelihood that customers' smaller
charges will result in multiple overdraft fees.  *Id.*

TD argues that the PDAA states that debits are posted from highest to lowest dollar
amount.  *See* Motion, p. 8.  However, the section cited by TD is both taken out of context and
given a liberal construction because it states that the items are posted by category,[1] and then
"[w]ithin categories i, ii, and iii, *we post items in order from largest to smallest.*"  CAC, Ex. A,

---

[1] "We then post items to your Account *by category*, in the following order: i) Outgoing wire
transfers, deposit return chargebacks, and debit adjustments to your Account balance; ii)
Overdraft fees, other returned item fees, and deposit return fees; iii) All other Account fees . . .
and all other items . . . ."  CAC, Ex. A, p. 12 (emphasis added).

p. 12 (emphasis added).  This is hidden within prior layers regarding posting categories and does not clearly notify the customer that "debit card transactions" will be posted from "highest to lowest dollar amount."  Indeed, nowhere in the PDAA is the customer ever expressly informed that "debit card charges" are ordered from high to low.  Plaintiffs allege that the PDAA repeatedly suggests that debit card transactions that would push the account below zero would not be approved and, logically, should not be included in any posting order.  *See* CAC ¶ 130.

The CAC alleges that this practice violates the parties' contracts and the covenant of good faith and fair dealing (*id.* at ¶ 121).  As a result of this practice, Plaintiffs have incurred overdraft fees when they actually had sufficient funds to cover the transactions.  *Id.* at ¶ 135.

### 3.    The PDAA Fails to State That TD Bank Will Assess Overdraft Fees on Debit Card Transactions That Overdraw the Account.

The PDAA actually offers incomplete or unduly ambiguous disclosures as to its actual practices.  CAC ¶ 129.  The PDAA repeatedly suggests that debit card transactions which would push the account below zero will not be approved.  For example, the PDAA states that the Bank uses the "available balance" (which is always equal to or lower than the real balance) to "determine the amount available to pay other items presented against your account."  *Id.* at ¶ 130; CAC, Ex. A, p. 12.  Thus, when the "available balance" falls below zero, transactions should be rejected.  In order to maximize its fee income, however, TD has chosen to disregard this aspect of its own contract and to willfully approve debit card transactions that it knows will accrue overdraft fees.  Not only does this breach the contract, it runs counter to customers' common sense expectations that a debit or ATM card is not a credit card.  TD has developed a system whereby it secretly adopts a hidden credit line for each customer, and then treats their debit card as a credit card, but a credit card where exorbitant fees are charged for each use.

The PDAA also says that "WE MAY REFUSE TO PAY A CHECK OR OTHER ITEM

5

WHICH: . . . b) is drawn in an amount greater than the amount of funds then available for withdrawal in your Account (see the Funds Availability Policy) or which would, if paid, create an overdraft . . . ."  CAC ¶ 130, Ex. A, at 13.  The Funds Availability Policy does not vary these terms.  *Id.*  Thus, TD's decision to treat debit cards as credit cards violates its own contract.

Although TD does ambiguously offer that some transactions may not be rejected – stating that the Bank may decide to "advance" funds and charge an overdraft fee – this does not refer to all items, including debit card transactions.  CAC ¶ 130; Ex. A at 14 ("advances" allowed only for "check, in-person withdrawal, ATM withdrawal, or a withdrawal by other electronic means from your Account"); *cf.* Ex. A at 12 (showing text when all items to be included:  "all other items, including checks, ATM transactions, and debit card transactions").  Therefore, at least as to debit card purchases, TD is precluded from knowingly approving transactions for which it intends to assess an overdraft fee.  TD has adopted a hidden practice of intentionally approving debit card transactions that it knows will result in overdraft fees, despite contractual language to the contrary.  CAC ¶ 130.  The PDAA leads customers to believe that TD will not advance funds on accounts that fall below zero, thereby eliminating the risk of overdraft fees.

### 4.    The PDAA's Charges on Sustained Overdrafts Are Usurious.

TD's contract addresses sustained overdrafts as follows:

**Sustained Fee for Overdrawn Accounts**
We may charge you a fee, as disclosed on the Personal Fee Schedule, for any Checking or Money Market Account that remains in overdrawn status for ten (10) consecutive Business Days.  We will notify you if your Checking or Money Market Account is in overdrawn status.  If your Checking or Money Market Account is in overdrawn status because of an overdraft, check returned for insufficient funds or for any other reason and the Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.  If you have overdraft protection and you have exceeded your limit and the Check or Money Market Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.

CAC, Ex. A, p. 14.  Such extensions of credit over time are *de facto* loans made without a

specific loan agreement.  By covering overdrafts over defined time periods, TD has knowingly extended credit and charged a fee.  CAC ¶ 247.  Although TD is only permitted to charge Plaintiffs and the putative class a maximum of 6.25% annualized interest on these *de facto* loans and extensions of credit, TD Bank has knowingly charged and collected "sustained" overdraft fees that far exceed the permissible rate under law.  *Id.* at ¶ 248.

### III.    Prior Proceedings.

**A.    MDL 2036.**  As Defendant acknowledges, TD was a defendant in the multidistrict litigation known as *In re Checking Account Overdraft Litigation* in the Southern District of Florida (the "MDL").  Several of the defendant banks in the MDL filed an omnibus motion to dismiss, addressing claims similar to those made by Plaintiffs here.  The MDL court largely denied the motion.  *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302 (S.D. Fla. 2010).  TD also filed a motion to dismiss in the MDL, which was also denied by the court.  *See* Order Denying TD Motion to Dismiss (Dkt. No. 934 in Case No. 09-md-02036-JLK (S.D. Fla.)) (Ex. 1 hereto).  TD ultimately settled the cases against it for $62 million.

Unlike the majority of other banks that settled their cases in the MDL, however, TD chose not to end its abusive overdraft practices.  *Compare* TD Bank Final Approval Order (Dkt. No. 1-4) (Ex. 2 hereto) *with* PNC Bank Final Approval Order (Dkt. No. 3580 in Case No. 1:09-md-02036-JLK (S.D. Fla.)) (agreeing to implement time-ordered posting rather than high-to-low posting as part of settlement) (Ex. 3 hereto).  TD did amend its customer agreement during and after the MDL litigation but it never set out its actual practices.

The claims brought by Plaintiffs here do differ in some respects from those brought in *In re Checking Account Overdraft Litigation*.  While Plaintiffs continue to take issue with TD's practice of reordering transactions from high-to-low, Plaintiffs also focus on TD's practices of

assessing overdraft fees even when a customer has sufficient funds in their account to cover all merchant requests for payment and approving debit card transactions even when TD knows such approval will result in the assessment of an overdraft fee. *See* CAC ¶¶ 101-35.

B.    ***Hughes v. TD Bank.***  While the cases against TD were pending in MDL 2036, an additional case was filed against TD in the District of New Jersey, styled *Hughes v. TD Bank, N.A.*, Case No. 11-cv-07257 (filed Dec. 12, 2011).  On February 17, 2012, TD moved to dismiss five of the six counts in *Hughes* by arguing that precedent directly on point in the Third Circuit – *Hassler v. Sovereign Bank*, 644 F. Supp. 2d 509 (D.N.J. 2009), *aff'd* 374 Fed. App'x 341 (3d Cir. 2010) – required dismissal.  On April 19, 2012, Judge Irenas denied TD's motion to dismiss in its entirety.  *Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673 (D.N.J. 2012).

C.    ***King v. TD Bank.***  As TD acknowledges in its motion, prior to the creation of this MDL, *King v. TD Bank* was the subject of a motion to dismiss that was decided by Judge Cain. *See* 26 F. Supp. 3d 510 (D.S.C. 2014).  TD's attempts to diminish the importance of Judge Cain's prior ruling are not well taken.  Regardless of whether Judge Cain's decision included sufficient analysis to meet Defendant's requirements, the fact remains that the overwhelming majority of the substantive issues raised by TD in its current motion – *i.e.*, preemption, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, unconscionability, and conversion – were fully briefed before Judge Cain.  TD fails to provide this Court with any legitimate reason why Judge Cain's decision should be discarded.

TD's argument based upon *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005), and *Astarte Shipping Co. v. Allied Steel & Export Service*, 767 F.2d 86 (5th Cir. 1985), that Judge Cain's decision in *King* should be disregarded is unpersuasive.  In both of these cases, the earlier decisions at issue were made by a transferor court prior to the creation of the MDL.  *Pinney*, 402

8

F.3d at 452-53; *Astarte*, 767 F.2d at 87.    Here, the District of South Carolina is both the transferor court and the transferee court.    Undoubtedly a transferee court in an MDL can modify interlocutory orders entered by the transferor court prior to transfer, but Judge Cain's decision is the decision of this Court.    *In re TD Bank Debit Card Overdraft Fee Litig.*, MDL 2613, 2015 WL 1519035, at *1 (J.P.M.L. Apr. 2, 2015).    TD's attempts to denigrate Judge Cain's decision in *King* should be rejected.

## IV.    Argument and Citation of Authorities.

**A.    Plaintiffs' Claims Are Not Preempted by Federal Law.**[2]    Defendant argues that Counts II – VI of the CAC are preempted by the National Bank Act ("NBA") and related Office of Comptroller of Currency ("OCC") regulations because such claims "significantly impair" TD's powers to receive deposits and conduct the business of banking.    Motion, pp. 12-24.    Time and again, however, courts have rejected this argument in the context of claims challenging TD overdraft fees.    *E.g.*, *King*, 26 F. Supp. 3d at 514-17; *Hughes*, 856 F. Supp. 2d at 680; Order Denying TD Motion to Dismiss, p. 1.    Most recently, this Court held in *King*:

> Plaintiffs' claims as alleged only incidentally affect TD Bank's deposit-taking powers and TD Bank has not established that refraining from the challenged wrongful conduct would prevent or significantly interfere with its ability to engage in the business of banking.    The court cannot conclude at this time that preemption applies as a matter of law.    Accordingly, at this stage in the litigation, the court denies TD Bank's Motion to Dismiss based upon preemption.

26 F. Supp. 3d at 517.    Defendant argues that *King* should be cast aside, claiming it "is not binding in this MDL proceeding."    Motion, p. 13 n.8.    Given that preemption is a federal legal issue and the governing law has not changed, this Court should adhere to *King*.

Even if this Court is not bound by *King*, it does owe considerable deference thereto.    *E.g.*,

*In re Upjohn Co. Antibiotic Cleocin Prods. Liab. Litig.*, 64 F.2d 114, 119 (6th Cir. 1981)

---

[2] TD Bank does *not* argue that Counts I (express breach of contract), VII (violation of the Electronic Funds Transfer Act), or VIII (NBA violations) are preempted.    *See* Motion, p. 12 n.7.

("transferee judge ought as a practical matter to accord considerable deference to the judgment of the transferor court"); *In re Terrorist Attacks on Sept. 11, 2011*, 349 F. Supp. 2d 765, 780 n.2 (S.D.N.Y. 2005) (giving deference to transferor court). Deference is especially warranted here because TD seeks to preempt the *same* claims that were at issue in *King* using the *same* arguments. *Compare* Motion, pp. 12-24 (identifying preemptible claims as those alleging TD improperly charged overdraft fees (i) when there are funds in the account, (ii) as a result of reordering debit card transactions from high-to-low, and (iii) on transactions intentionally authorized into overdraft without notice) (citing CAC ¶ 1) *with King* Complaint, ¶¶ 50-65 (asserting the same three claims) (Dkt. No. 22 in Case No. 13-cv-2264-TMC (D.S.C.)) *and King* Motion to Dismiss (Dkt. No. 24-1, pp. 12-22). There is no reason for this Court to revisit the *same* claims and arguments that it recently rejected in *King*. *DeGulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1309 (S.D.N.Y. 1996) ("the fact that this Court can reconsider the [transferor court's] Order does not mean that it need do so or should do so"). However, in an abundance of caution, Plaintiffs once again show why their claims are not preempted.

### 1.    TD Bank Cannot Meet Its Heavy Burden of Proving Preemption.

The party seeking to establish preemption bears a heavy burden of proof. *E.g.*, *Fifth Third Bank v. CSX Corp.*, 415 F.3d 741, 745 (7th Cir. 2005) ("preemption is an affirmative defense upon which the defendants bear the burden of proof"); *Iberia Credit Bureau, Inc. v. Cingular Wireless*, 668 F. Supp. 2d 831, 837 (W.D. La. 2009) (preemption "is not lightly found" and proponent "bears a heavy burden of proof"). Courts "have long presumed that Congress does not cavalierly pre-empt state-law." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

TD Bank incorrectly argues that the activities of a national bank are "presumptively" immune from state law claims. Actually "there is no presumption that the NBA preempts state

law." *Young v. Wells Fargo & Co.*, 671 F. Supp. 2d 1006, 1021 (S.D. Iowa 2009). Rather, the NBA only serves to preempt "*contrary* state law." *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 32 (1996) (emphasis added). TD cannot meet its heavy burden. Indeed, the Supreme Court has long held that national banks are subject to state laws of general application, such as breach of contract and common law claims. *E.g.*, *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 534 (2009) (states "have always enforced their general laws against national banks"); *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2009) ("Federally chartered banks are subject to state laws of general application"). This holding has been consistently recognized by federal courts. *E.g.*, *Decohen v. Capital One, N.A.*, 703 F.3d 216, 226 (4th Cir. 2012) (vacating dismissal of breach of contract claim based on NBA preemption); *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 326 (4th Cir. 2012) (finding court erred in concluding plaintiff's state law claims were preempted by NBA); *Trombley v. Bank of Am. Corp.*, 715 F. Supp. 2d 290, 296 (D.R.I. 2010) ("The state laws [regarding] the duty of good faith and fair dealing are not preempted and the claim will not be dismissed."); *Great W. Res., LLC v. Bank of Ark., N.A.*, 2006 WL 626375, *3-4 (W.D. Ark. Mar. 13, 2006) (declining to dismiss breach of contract, Arkansas Deceptive Trade Practices Act, conversion, and good faith claims); *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*, 2009 WL 4063349, *9 (N.D. Cal. Nov. 20, 2009) (rejecting preemption, finding "no authority providing that if a national bank enters into a contract and subsequently breaches an implied term of such contract, the customer lacks the ability to seek a remedy under state contract law"); *Baldanzi v. WFC Holdings Corp.,* 2008 WL 4924987, *3-4 (S.D.N.Y. Nov. 14, 2008) ("causes of action sounding in contract, consumer protection statutes and tort have repeatedly been found by federal courts not to be preempted").

Indeed, the NBA does not preempt state laws that "merely require all businesses,

including banks," to refrain from improper behavior – such as breaching contracts and committing torts. *Young*, 671 F. Supp. 2d at 1021-22. By now, TD Bank should be well aware of this principle. *E.g.*, *Mwantembe v. TD Bank, N.A.*, 669 F. Supp. 2d 545, 551 (E.D. Pa. 2009) ("Because national banks are subject to state laws that do not contradict national banking laws or impose an undue burden on the banks, state laws applied to national banks are not *ipso facto* preempted"); *Poskin v. TD BankNorth, N.A.*, 2009 WL 2981963, *21 (W.D. Pa. Sept. 11, 2009) (no preemption of "a law of general applicability, and not targeted directly at banking").

Overdraft fee-related litigation has generated several decisions at the motion to dismiss stage confirming this principle. *E.g.*, *King*, 26 F. Supp. 3d at 514-17; *Hanjy v. Arvest Bank*, __ F. Supp. 3d __, 2015 WL 1456186, *4-10 (E.D. Ark. Mar. 31, 2015); *In re HSBC Bank, USA, N.A., Debit Card Overdraft Fee Litig.*, 1 F. Supp. 3d 34, 45-48 (E.D.N.Y. 2014), *modified by*, 14 F. Supp. 3d. 99, 106-07 (E.D.N.Y. 2014); *Hughes*, 856 F. Supp. 2d at 680; *In re Checking Account Overdraft Litig.*, 797 F. Supp. 2d 1312, 1316-21 (S.D. Fla. 2011); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d 1302, 1313-14 (S.D. Fla. 2010); *White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1367 (N.D. Ga. 2008); *Old National Bank v. Kelly*, 31 N.E.3d 522, 528-31 (In. Ct. App. 2015); *Higgins v. Pinnacle Fin. Partners, Inc.*, Case No. 11-C4858, slip op. at 1-2 (Tenn. 5th Cir. Ct. May 16, 2012) (Ex. 4 hereto). These decisions are extremely persuasive because they addressed preemption in the same context as this case.

In the *In re Checking Account Overdraft* MDL, for example, the court reiterated that "State laws of general applicability . . . have been found not to be preempted" and held:

> The OCC also addresses federal preemption of regulations on deposit-taking activities. In Section 7.4007(b)(2) the OCC states "[a] national bank may exercise its deposit-taking powers without regard to state law limitations concerning: . . . ii) Checking accounts; iii) Disclosure requirements; iv) Funds Availability . . ." 12 C.F.R. § 7.4007(b)(2). The OCC goes onto clarify "state laws that are not preempted" in Section (c): "State laws on the following subjects are not

> inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers: 1) Contracts; 2) Torts; 3) Criminal History . . ." 12 C.F.R. § 4007(c).
>
> The state law claims before this Court are contract and tort claims; thus this Court's inquiry is limited to whether Plaintiffs' claims, as alleged, more than "incidentally affect the exercise of national banks' deposit taking powers." The Court finds that they do not and are therefore not preempted.
>
> Defendants assert that the language of the OCC expressly preempts any state law regulations on overdraft fees, but this is not the case. Section 7.4002 gives Defendant banks the right to charge overdraft fees, but it does not authorize banks to ignore general contract or tort law. Further, the OCC's interpretative letter does not authorize debit card postings in a high to low order to increase fees, it merely states that doing so does not *violate* the OCC's requirement that banks set fees using sound banking judgment. A bank could follow both the requirements of sound banking judgment outlined in Section 7.4007 and good faith; these principles are not in irreconcilable conflict.

694 F. Supp. 2d at 1311-13. In *HSBC Bank*, the court relied heavily on the MDL analysis to explain why breach of contract and other claims were not preempted. 1 F. Supp. 3d at 47 ("state laws of general application [] do not vitiate the purposes of the NBA, and banks could comply with both the NBA, OCC regulations[,] and state laws if they refrained from engaging in the criticized posting procedures"); *also Hughes*, 856 F. Supp. 2d at 680 ("federal regulation did not irreconcilably conflict with common law contract and tort principles"); *Higgins*, slip op. at 1-2.

In *White v. Wachovia Bank*, the District Court held that "this court is unprepared to hold that the state laws under which Plaintiffs assert their claims are contrary to federal banking law." 563 F. Supp. 2d at 1366. In reaching this conclusion, the court rejected the same arguments relied upon by TD. *See* Motion, pp. 16-20. First, the court expressly rejected the suggestion that 12 C.F.R. § 7.4007 would require preemption. *Id.* at 1367. The court noted that 12 C.F.R. § 7.4007(c) provides that state laws on the subjects of contracts and torts are "not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers" and held that:

> Plaintiffs' claims that Wachovia charged overdraft fees **when there was actually money in the account sufficient to pay their drafts**, sound in tort and contract. Based upon the record now before it, the court finds that Plaintiffs' exercise of their rights under Georgia contract and tort law does not more than incidentally affect Wachovia's deposit-taking powers.

*Id.* (emphasis added). Plaintiffs assert these allegations here, namely that TD charged overdraft fees when there was actually sufficient money in the account. Motion, p. 12 (admitting same). The *White* court also rejected the bank's suggestion that 12 C.F.R. § 7.4002 was a proper basis for preemption where the allegation was overdraft fees assessed in violation of contractual terms:

> the court does not read 12 C.F.R. § 7.4002 to authorize banks to impose an overdraft fee when an account is not in fact overdrawn. As such, contract and tort claims alleging that a bank did exactly that are not inconsistent with Section 7.4002. Plaintiffs' state law claims of improper overdraft fees and an improperly implemented posting policy present no conflict with 12 C.F.R. § 7.4002 and therefore survive Wachovia's preemption defense on a motion to dismiss.

563 F. Supp. 2d at 1367 (citing *Watters,* 127 S. Ct. at 1567).

In short, TD presents the same preemption arguments that have been repeatedly rejected in overdraft fee cases (including in three TD overdraft cases), and "this is not a case of 'whoever tells the best story wins.'" *Jackson v. U.S. Bank, N.A.*, 44 F. Supp. 3d 1210, 1216 (S.D. Fla. 2014) (rejecting same preemption defense that had already been repeatedly rejected in other forced place insurance cases) (cite omitted). TD's preemption arguments remain unfounded.

### 2.    *Gutierrez* and Other Inapposite Authorities Do Not Vary the Result.

Predictably, Defendant's preemption argument relies heavily on the Ninth Circuit's decision in *Gutierrez v. Wells Fargo Bank, N.A.*, 704 F.3d 712 (9th Cir. 2012). The Bank's reliance on this decision is misplaced. The Ninth Circuit's analysis is wholly inapposite to claims for breach of contract **because *Gutierrez* did not consider breach of contract claims**. Rather, the case analyzed a challenge to the bank's reordering of transactions under California's unique Unfair Competition Law ("UCL"). *Id.* at 717 (describing claim as based solely on UCL);

*see generally Gutierrez* Complaint (attached hereto as Ex. 5).  *Gutierrez* did not consider a claim for breach of contract.[3]  704 F. 3d at 725 (repeatedly addressing "good faith" only in the context of the UCL).  As the Supreme Court held in 2009, national banks "are subject to [such] state laws of general application in their daily business to the extent such laws do not conflict with the" NBA.  *Watters*, 550 U.S. at 11 (quoting *First Nat'l Bank*, 76 U.S. at 362).  State laws employed to enforce promises or representations made by banks will not be preempted.  *E.g.*, *In re Ocwen Loan Servicing, LLC*, 491 F.3d 638, 643-44 (7th Cir. 2007).

As noted above, the OCC regulations expressly preserve this important role for state law, like the common law claims Plaintiffs assert here.  *See* 12 C.F.R. § 7.4007(c); *cf.* § 7.4002(d) (noting the OCC follows Supreme Court's preemption principles in determining "whether State laws apply that purport to limit or prohibit charges and fees . . .").  Of course, there was no reason for the *Gutierrez* court to deal with such issues because such claims were not raised.[4]

Additionally, the Ninth Circuit was plainly influenced by the distinct nature of the relief the plaintiffs sought and which the District Court imposed on Wells Fargo.  The Ninth Circuit stated at the outset of its opinion that "as a practical matter, the remedy ordered by the district court boils down to a *complete prohibition* on the high-to-low sequencing method."  *Gutierrez*, 704 F.3d at 723 (emphasis added).  The District Court had issued a permanent injunction that

---

[3] Count VI of the CAC does seek relief for TD Bank's violation of several consumer protection statutes; however, much of the basis therefore is TD's violation of EFTA, a claim which TD has not argued is preemptible.  *See* CAC, ¶¶ 165-67.  Moreover, since *Gutierrez*, courts have held that similar claims for violation of consumer protection statutes are not preemptible.  *E.g., HSBC Bank*, 1 F. Supp. 3d at 47 (finding virtually identical allegations under various consumer protection statutes to do no more than incidentally affect banking powers).
[4] It should be noted that *Gutierrez* was a short-lived victory for Wells Fargo.  The Ninth Circuit recognized that some deceptive overdraft fee practices were not preempted and remanded the case to determine "what relief, if any, is appropriate and consistent with this opinion."  704 F.3d at 730.  Upon remand, the District Court reinstated the $203 million judgment.  944 F. Supp. 2d 819, 828 (N.D. Cal. 2013) (holding that bank's misleading, deceptive conduct warranted relief).  This decision was subsequently affirmed.  589 Fed. App'x 824, 827 (9th Cir. 2014).

compelled Wells Fargo to take various actions, such as ceasing its practice of posting in high-to-low order for all debit card transactions, reinstating a low-to-high or chronological posting method (or some combination thereof), and changing its disclosures and agreements. *Id.* at 718, 723. The Ninth Circuit found this injunction to "dictate Wells Fargo's choice of posting method," *id.* at 723, and concluded that "a 'good faith' limitation applied through California's Unfair Competition Law ("UCL") is preempted *when applied in a manner* that prevents or significantly interferes with a national bank's federally authorized power to choose a posting order." *Id.* at 725 (emphasis added). The concerns about a coercive remedy that motivated the Ninth Circuit are not present in this case. Here, Plaintiffs seek damages for TD's common law violations. Unlike the *Gutierrez* plaintiffs, Plaintiffs here do not seek injunctive relief to compel the Bank to change its posting order or to implement any disclosures. Thus, this case does not present the risk of an application of a state law that "prevents or significantly interferes with a national bank's federally authorized power to choose a posting order." *Id.*

The MDL court has examined this issue several times and carefully demarcated the line separating state law claims that would significantly interfere with bank operations, and thus be preempted, and permissible ones that only incidentally affect them:

> none of the MDL Plaintiffs have claimed that banks are unable to charge fees to their customers. Indeed such a claim would fail in light of the OCC's interpretation of the NBA, which permits banks to "charge fees and to allow banks latitude to decide how to charge them." *See also* 12 C.F.R. § 7.4002(b)(2). Instead, Plaintiffs only seek recovery for the manner in which banks manipulated their debit and checking charges, rather than the manner in which those fees were computed. *Cf. In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1313-14.

> The Court previously noted this same distinction in its Omnibus Order. However, it bears further discussion. A desire to limit a bank's authority to charge a fee is not synonymous with a desire to hold a bank liable for the bad-faith manner in which an account is reorganized to justify a larger number of overdraft charges. *Baptista* holds that the former cannot be permitted in light of the NBA's preemptive reach. But neither this Court nor the Eleventh Circuit can prevent a lawsuit by an

16

individual under the latter, since the NBA has not foreclosed such claims.  Instead, very much to the contrary, 12 C.F.R. § 7.4007(c) states as follows:

> State laws are not preempted. State laws on the following subjects are not inconsistent with the deposit-taking powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' deposit-taking powers: (1) Contracts; (2) Torts . . . .

*Id.* (emphasis added). Inherently, therefore, the NBA rests upon a foundation of state contract law that it does not — it cannot — preempt.

> . . . . *Plaintiffs seek only to ensure that the banks' actions are not taken in bad faith and in breach of the banks' duty to act in good faith towards their depositors.* Notwithstanding the substantial damages alleged by Plaintiffs, the oft-presumed duty of good faith and fair dealing is certainly subordinate to a bank's ability to "charge fees and to allow banks latitude to decide how to charge them."  Moreover, insomuch as Plaintiffs are seeking only to enforce the "sound banking judgment and safe and sound banking principles," *Baptista*, 640 F.3d at 1198 n.2, the purpose of their claims are harmonized with the stated intent of the NBA.

797 F. Supp. 2d at 1321-22 (emphasis added and note omitted)[5]; *accord HSBC Bank*, 1 F. Supp. 3d at 47 (distinguishing *Gutierrez*); *Old Nat'l Bank*, 31 N.E.2d at 530-31 (claim that bank "combined measures of delayed debiting, batching, and posting such that the Bank abused its contractual discretion and violated a duty of good faith and fair dealing" not preempted).

Indeed, the MDL court had little difficulty reconciling OCC guidance and good faith:

> Section 7.4002 gives Defendant banks the right to charge overdraft fees, but it does not authorize banks to ignore general contract or tort law. Further, the OCC's interpretive letter does not authorize debit card postings in a high to low order to increase fees, it merely states that doing so does not violate the OCC's requirement that banks set fees using sound banking judgment. A bank could follow both the requirements of sound banking judgment outlined in Section 7.4007 and good faith; these princip[le]s are not in irreconcilable conflict.

797 F. Supp. 2d at 1319 (internal quotation marks omitted).  In other words, "sound banking judgment" incorporates the concept of good faith, and an application of the contractual principle of good faith would not impinge the freedom of national banks to charge fees.  An OCC

---

[5] The MDL court has confirmed that its preemption holdings are unaffected by *Gutierrez*.  *Steen v. Capital One, N.A.*, Case No. 1:09-md-02036-JLK, slip op. at 7-10 (S.D. Fla. June 24, 2014) (holding *Gutierrez* does not alter prior rulings on preemption and citing other post-*Gutierrez* decisions, including *King* and *HSBC Bank*, in support) (Ex. 6 hereto).

Interpretative Letter which addressed a Texas check-posting statute which required banks "to act in good faith" makes this point clear.  OCC Interp. Letter No. 997, 2002 WL 32639293, at *2 (Apr. 15, 2002) (quoting statute; quotation marks omitted).  The OCC pointed out that:

> the check-posting provision of the Texas Commercial Code cited by the Banks, which permits the Banks to post checks in any order, is consistent with the federal law governing national bank fees, as embodied in section 7.4002(a). *We note further that a relevant factor in evaluating good faith may be whether a bank's actions were inconsistent with the practices it had represented to its customers that it would follow.* The Banks have represented that their deposit account agreement accurately describes the high-to-low posting order that the Banks use.

*Id.* (emphasis added).  In other words – and quite sensibly – the federal standard incorporates principles of good faith.  Remarkably, Defendant is asking the Court to grant it license to ignore the fundamental duty to act in accordance with contractual obligations.

Although *Gutierrez* uses the phrase "good faith," it is only in the context of the UCL, not in the context of breach of contract, which plainly cannot be preempted.  Plaintiffs here have shown that TD has breached express provisions of its contracts.  CAC ¶¶ 108-18, 130-34, 195-98.  Even TD acknowledges such claims cannot be preempted.  *See* Motion, p. 12 n.7.

Based on the foregoing, *Gutierrez* is inapposite.  The other cases cited by Defendant are equally unavailing.  For example, in *Baptista v. JPMorgan Chase Bank, N.A.*, 640 F.3d 1194 (11th Cir. 2011), the Eleventh Circuit held that a Florida statute which specifically prohibited banks from charging noncustomers a fee to cash a check was preempted by an OCC regulation which expressly allowed such fees.  *Id.* at 1196-98.  Similarly, in *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274 (6th Cir. 2009), the Sixth Circuit held that an Ohio statute which prohibited banks from charging service fees after receiving a garnishment order was preempted by OCC regulations which allow banks "to collect and set their service fees, [and their] federal authority to complete other transactions and balance their accounts."  *Id.* at 284.  These situations are a far cry from this case.  Plaintiffs do not challenge TD Bank's ability to charge overdraft

fees but, rather, challenge Defendant's ability to manipulate its overdraft program to maximize fees in violation of state contract and tort law. TD Bank has not met its burden of proving that such generally applicable claims stand as "an obstacle to the accomplishment and execution of the purposes and objectives of Congress." *Barnett Bank*, 517 U.S. at 31.

Finally, Defendant argues that allegations based on inadequate disclosure are expressly preempted. *See* Motion, pp. 22-23 (citing 12 C.F.R. § 7.4007 and *Montgomery v. Bank of Am. Corp.*, 515 F. Supp. 2d 1106 (C.D. Cal. 2007)). However, the inadequate disclosure allegations are made in the context of breach of contract and EFTA claims – claims which Defendant does not contend are preemptible. *Compare* CAC ¶¶ 5, 130, 134, 197 (Defendant failed to provide notice of debit card overdrafts in violation of contract), 136-38 (TD failed to provide notice of debit card overdrafts in violation of EFTA) *with* Motion, p. 12 (not identifying breach of contract and EFTA as claims preempted). Because Plaintiffs' inadequate disclosure allegations are made in the context of non-preemptible claims, the Bank's argument is groundless.[6]

**B.    Plaintiffs Have Valid State Law Claims.** TD argues that even if Plaintiffs' claims are not preempted, Counts I – VI and VIII should be dismissed because they are inadequate as a matter of law. As set forth more fully below, TD's arguments are unpersuasive.[7]

---

[6] Equally untenable is Defendant's position that claims against the state-chartered Carolina First Bank that arose before the merger with TD are preempted. *See* Motion, pp. 23-24; *e.g.*, *Mamot Feed Lot v. Hobson*, 539 F.3d 898, 902 (8th Cir. 2008) ("the National Bank Act does not apply to state-chartered banks"); *Griner v. Synovus Bank*, 818 F. Supp. 2d 1338, 1343-44 (N.D. Ga. 2011). None of the authorities cited by TD expressly hold otherwise. Indeed, TD's notion that state law claims against a state-chartered bank (even one that no longer exists) are preempted by an inapplicable federal law is absurd. States have traditionally been the primary regulators of state-chartered banks. *E.g.*, *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 38 (1980).

[7] TD Bank correctly points out in its Motion that Plaintiffs' state law claims implicate eleven states as well as the District of Columbia. TD primarily cites South Carolina law, and for the sake of consistency and the convenience of the Court, Plaintiffs do the same. Likewise, Plaintiffs also provide Appendix A (Ex. 7 hereto) listing other relevant state citations.

A plain reading of the CAC reveals that TD assessed overdraft fees against Plaintiffs even at times when there were sufficient funds in their accounts to cover the transactions at issue. *See* CAC ¶¶ 101-07. TD ignores these allegations, likely because TD's form contract at issue does not authorize such conduct. Plaintiffs also allege that TD breached the PDAA by manipulating transactions from highest to lowest. *See* CAC ¶ 14, 121, 180. As demonstrated herein, these allegations also sufficiently state a claim for relief.

### 1.    Plaintiffs Bring a Valid Breach of Contract Claim.[8]

TD's suggestion that Plaintiffs do not have a valid claim for breach of contract is unpersuasive. In South Carolina, like most states, the elements for breach of contract are the existence of a contract, its breach, and damage. *Lewis v. Omni Indem. Co.,* 2013 WL 4823401, at *14 (D.S.C. Sept. 9, 2013); *Fuller v. E. Fire & Cas. Ins. Co.*, 124 S.E.2d 602, 610 (S.C. 1962).

When interpreting a contract, a court must ascertain and give effect to the intention of the parties. *Chan v. Thompson*, 395 S.E.2d 731, 734 (S.C. Ct. App. 1990). However, "[a] contract is ambiguous when the terms of the contract are reasonably susceptible of more than one interpretation." *Dept. of Natural Res. v. McClellanville*, 550 S.E.2d 299, 302 (S.C. 2001). "The uncertainty in interpretation can arise from the words of the instrument, or in the application of the words to the object they describe." *Pee Dee Stores, Inc. v. Doyle*, 672 S.E.2d 799, 803 (S.C. Ct. App. 2009). "Once the court decides the language is ambiguous, evidence may be admitted to show the intent of the parties." *McClellanville*, 550 S.E.2d at 303 ("The determination of the parties' intent is then a ***question of fact***." (emphasis added). South Carolina, like nearly all states, resolves ambiguity in favor of the party that did not draft the contract. *E.g., S. Atl. Fin. Servs., Inc. v. Middleton*, 590 S.E.2d 27, 29 (S.C. 2003) ("Ambiguous language . . . interpreted

---

[8] TD has not moved to dismiss Plaintiffs' breach of contract claim as to Carolina First.

strongly in favor of the non-drafting party.").  Here, TD's form agreement cannot be modified by customers and, therefore, all ambiguities should be resolved in favor of Plaintiffs.

Here, Plaintiffs have repeatedly alleged facts satisfying the elements of breach of contract in their Amended Complaint.  As to most such allegations, TD fails to even offer a response.  For example, TD does not refute Plaintiffs' allegations that overdraft fees on debit card transactions would only be proper if such fees are deemed "reasonable" and were "requested" by Plaintiffs.  CAC ¶ 191.  TD cannot, of course, win the reasonableness inquiry on motion to dismiss. *Simmons v. Ciba-Geigy Corp.*, 302 S.E.2d 17, 18 (S.C. 1983); *Hobgood v. Pennington*, 387 S.E.2d 690, 693 (S.C. Ct. App. 1989).  Nor has the Bank asserted that any "request" was made for the debit card overdraft "service."  *See* Motion, pp. 24-28.  As explained below, the PDAA does not authorize the practices at issue and therefore TD is subject to liability.

> **a.    The PDAA Does Not Authorize TD Bank to Assess Overdraft Fees on a Customer's "Available Balance".**

The terms of the PDAA do not provide that TD has the right to assess an overdraft fee when an account is not overdrawn.  *See generally* CAC, Ex. A.  To the contrary, as noted by TD, the PDAA explains in detail how overdrafts may come about through the "PROCESSING ORDER FOR PAYMENT OF CHECKS AND OTHER ITEMS" portion of the agreement, yet never informs the customers that it will assess an overdraft fee when an account is not actually overdrawn.  *See* CAC ¶ 108-11, Ex. A at 11-12.  In fact, the contract only provides for overdraft fees "on items presented for payment that bring your Account into a negative balance, as well as any subsequent transactions presented for payment while the Account has a negative balance."  CAC, Ex. A, pp. 12-13.  This does not describe how the bank actually does business.

As alleged in the CAC, the PDAA explicitly provides that "Overdraft" is an "advance of funds" and results in fees that "may be assessed on items presented for payment that bring your

Account into a negative balance," and that "overdraft fees are not charged on "pending" authorizations. *See* CAC ¶ 2 (citing Ex. A, pp. 12-13). Despite this plain language, TD assessed overdraft fees in other instances. Rather than assessing fees based on the "balance" as stated in the Agreement, TD implemented a practice to base the assessment of overdraft fees on "available balance," which is a term of art defined by the Bank to be equal to or lower than a customer's actual balance of real money. CAC ¶¶ 3, 103-05. While TD does define "available balance" – essentially a customer's actual balance minus authorized debit card transactions – it does ***not*** utilize this term of art in explaining when the Bank is allowed to assess overdraft fees.

Throughout the PDAA, TD uses the term "balance," as opposed to "available balance," when it is intending to refer to the "actual" or "ledger" balance. For example, in Part II of the PDAA, where TD explains how interest paid to checking account holders is determined, it uses the term "balance" to refer to "actual balance," not "available balance":

> The Chart which follows indicates the *balance* tier levels used to determine the variable interest rate and APY being applied to your account. The interest rate and annual percentage yield for the appropriate tier will be paid on the full *balance* in the account.

CAC, Ex. A, at 24 (emphasis added). This is but one of many instances in which TD uses the term "balance" specifically to refer to "actual" or "ledger" balance. Indeed, the term "balance" without any modifier appears in the PDAA 35 times, and in the vast majority of these instances TD is clearly using the term "balance" to refer to the money in an account – in other words, the actual balance – as the following exemplify:

- ". . . upon your death, the **balance** in the Account . . . will belong to the survivor(s) . . ." (CAC, Ex. A, at 3 (emphasis added));
- "If two or more of you survive, you will own the **balance** in the Account as joint tenants . . ." (*id.* (emphasis added));
- "The Bank may release all or any part of the **balance** of the Account . . ." (*id.* at 4 (emphasis added));

- "**Balances** transferred to the non-transaction sub-account are transferred back to the transaction sub-account to meet these transactional needs, so there is no adverse impact on the availability of the **balances** held in your Checking Account" (*id.* at 7 (emphasis added));
- "if a sixth transfer is needed, we will return all **balances** to the transaction sub-account for the remainder of the statement cycle" (*id.* at 8 (emphasis added));
- "There are no separate or additional **balance** requirements, fees, or charges associated with the creation of these sub-accounts" (*id.* (emphasis added))
- "Overdraft fees may be assessed on items presented for payment that bring your Account into a negative **balance**" (*Id.* at 13 (emphasis added));
- "If the Checking Account remains in overdrawn status for sixty (60) Calendar Days, or such earlier time that we determine that the overdraft **balance** is uncollectible . . ." (*Id.* at 14 (emphasis added)); and
- "We may consider any Account (excluding CDs) having a zero **balance** for forty-five (45) Calendar Days to be closed . . ." (*Id.* at 22 (emphasis added)).

It is only in defending its overdraft practice that TD contends that the term "balance" is obviously meant to refer to the "available balance." This construction is not reasonable.

Furthermore, contrary to TD's assertion, the use of the term "available" in its overdraft program opt-in contract form stands for the opposite construction to that urged by the Bank. In this document, TD states that by opting in to the TD Debit Card Advance program, TD Bank "may authorize ATM transactions or one-time debit card purchases ***when you do not have enough money available in your account*** so you may be able to complete your transaction, but it may result in a fee." CAC, Ex. B (emphasis added). It goes on to state that an "***overdraft occurs when you do not*** have enough money available in your account to cover a transaction." *Id.* (emphasis in original). As a matter of both law and common sense, the amount of money in an account at any given time is reflected by the "actual" or "ledger" balance of that account at that time. Here, by stating that an overdraft occurs when there is not "enough ***money*** available in your account," the customer is being told that an overdraft transaction will occur when the amount of the transaction exceeds the "actual" or "ledger" balance of the account. If TD had intended to disclose to customers that overdraft transactions would occur where the transaction

amount exceeded the "available balance" of the account, it need only have said so.  Thus, overdraft fees based on "available balance" violate the TD Agreement.

Plaintiffs have already once established that TD's practices violate its own agreement and present a viable breach of contract claim not subject to dismissal.  Prior to its consolidation in MDL 2613, *King* was the subject of a motion to dismiss made in this Court.  This Court held:

> In the Amended Complaint, Plaintiffs allege that TD Bank violated the Account Agreement by instituting overdraft fee practices which were never disclosed, not reasonable, and not permitted by the Account Agreement, violating the Account Agreement and the implied covenant of good faith and fair dealing.  (Am. Compl. ¶¶ 91, 95).  At this stage of the litigation, Plaintiffs have sufficiently alleged a breach of contract and/or the implied covenant of good faith and fair dealing claim to survive a motion to dismiss.

26 F. Supp. 3d at 518.  For these reasons, Plaintiffs have sufficiently alleged that the practice of assessing overdraft fees on "available balance" rather than actual balance is a breach.

### b.    The PDAA Fails to Clearly and Unambiguously State That TD Posts Items in High-to-Low Order.

TD argues that it discloses, through the PDAA, that it posts items in order from highest to lowest by dollar amount, and therefore it could not have breached the contract.  However, Plaintiffs allege that the PDAA offers incomplete disclosures as to its actual practices.  *See* CAC ¶¶ 129-30.  As stated *supra,* the section cited by TD is taken out of context and given a liberal construction.  In fact, the section states that the items are posted by category, and then all other items are posted from highest to lowest.  CAC, Ex. A, p. 12.  This is hidden within prior layers of categorical postings and does not provide notice to the customer that debit card transactions will be posted high-to-low.  Moreover, Plaintiffs have alleged that the PDAA repeatedly suggests that debit card transactions which would push the account below zero would not be approved, and therefore should not be included in any category.  *See* CAC ¶ 130.

24

Although the PDAA does contradict itself later and provide that some transactions may not be rejected – rather the Bank may decide to "advance" funds and charge an overdraft fee – this pointedly does not refer to **all** items, **including debit card transactions**. *See id.; see also* Ex. A, at 12-14. TD also directs the Court's attention to the TD Debit Card Advance Brochure for support that TD disclosed that transactions would be posted from highest to lowest. *See* Motion, p. 27. However, TD's reliance on the TD Debit Card Advance Brochure is inappropriate. It is no defense for TD to argue that even if the PDAA did not adequately disclose its overdraft fees, that these practices were disclosed elsewhere, when such documents are not contractual in nature and do not and cannot vary the parties' agreement. *Gilliland v. Elmwood Props.*, 391 S.E.2d 577, 581 (S.C. 1990). As will be discussed below, even assuming *arguendo* that the language of the PDAA was sufficiently clear to give TD the discretion as to the circumstances under which it would impose overdraft fees, its practice of assessing overdraft fees on debit card transactions based on available balance and posted in a high-to-low order constitutes a breach of good faith and fair dealing. Instead of processing such transactions in chronological order, TD processes them by amount solely to generate the largest possible number of overdrafts and the greatest possible number of fees. CAC ¶¶ 125-28. The CAC alleges that this practice violates the contract and good faith in that, as a result of this practice, Plaintiffs have incurred overdraft fees when they actually had sufficient funds to cover the transactions. *Id.* at ¶¶ 121, 135.

### c.     The PDAA Provides That Overdraft Fees Will Not Be Assessed on Debit Card Transactions.

Finally, Plaintiffs allege that the PDAA does not provide notice to customers that the Bank may assess overdraft fees for debit card transactions. *See* CAC ¶¶ 1, 5, 130. TD argues that the PDAA discloses that "'[o]verdraft fees may be assessed on items presented for payment that bring your Account into a negative balance'" and expressly defines "item" to include

"electronic transaction." *See* Motion, p. 28. However, this does not amount to "notice" that overdraft fees are assessed on debit card transactions, particularly when the PDAA provides that debit card transactions which would push the account into the negative will not be approved. *See* CAC ¶ 130. One example is the Bank's use of the "available balance" (which is always equal to or lower than the real balance) to "determine the amount available to pay other items presented against your account." *See* CAC ¶ 130, Ex. A, p. 12. It also states that "WE MAY REFUSE TO PAY A CHECK OR OTHER ITEM WHICH:…b) is drawn in an amount greater than the amount of funds then available for withdrawal in your Account (see the Funds Availability Policy) or which would, if paid, create an overdraft . . . ." *See* CAC ¶ 130, Ex. A, p. 13.

As explained in detail above, when the customer's "available balance" falls below zero, transactions should be rejected under the plain terms of the PDAA. TD's practice of disregarding and breaching its own contract to willfully approve debit card transactions that it knows will accrue overdraft fees caused Plaintiffs to incur unanticipated overdraft charges. Consequently, dismissal of the breach of contract claims must be rejected in its entirety.

### 2. Plaintiffs' Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing Is Properly Alleged.[9]

Contrary to TD assertions, Plaintiffs do not attempt to utilize the covenant of good faith and fair dealing to vary the express terms of the contract. Instead, it is TD that is attempting to vary the express terms of the PDAA by treating "balance" and "available balance" as synonymous terms when they are not. Plaintiffs have alleged an express breach of the PDAA based on the manner in which TD has assessed overdraft fees, and there is no intent on Plaintiffs' part to vary the terms of the contract. Under South Carolina law, as well the other ten applicable

---

[9] TD purports to move to dismiss Plaintiffs' good faith and fair dealing claim as to Carolina First, but fails to substantively brief this issue and provides the Court with no reason to depart from Judge Cain's earlier conclusion in *King*.

26

states and the District of Columbia,[10] there exists in every contract an implied covenant of good

faith and fair dealing. *Commercial Credit Corp. v. Nelson Motors, Inc.*, 147 S.E.2d 481, 484

(S.C. 1966) ("'In the absence of an express provision therefore, the law will imply an agreement

by the parties to a contract to do and perform those things that according to reason and justice

they should do.'") (cite omitted).   Whether a defendant breached good faith and fair dealing is

generally a question of fact. *See Conner v. City of Forest Acres*, 560 S.E.2d 606, 611 n.5 (S.C.

2002) ("it is generally a jury question as to whether the employer acted reasonably pursuant to

the employment contract"); *Shelton v. Oscar Mayer Foods Corp.*, 459 S.E.2d 851, 857 (S.C. Ct.

App. 1995), *aff'd*, 481 S.E.2d 706 (S.C. 1997); *Chestnut v. Am. Gen. Life Ins. Co.*, 2013 WL

314758, at *6 (D.S.C. Jan. 28, 2013).

　　　Here, Plaintiffs contend that TD did not, and does not, adhere to that duty in assessing

overdraft fees.  *E.g.*, CAC ¶ 202.   In asserting this claim, Plaintiffs are not attempting to assert

good faith and fair dealing to vary the terms of the PDAA, but instead to enforce TD's obligation

---

[10] *See* Appendix A for the relevant state citations as to good faith and fair dealing.  Although TD
argues in footnote 15 of its Motion to Dismiss that, under the laws of New York, Vermont, and
Pennsylvania, the claim for breach of good faith and fair dealing should be dismissed simply
because it is based on the same facts as, and is therefore duplicative of, the breach of contract
claim, it is permissible to bring a breach of contract claim and a separate good faith claim if the
implied covenant claim is supported by distinct factual allegations, as it is in the instant case.
Here, Plaintiffs' claims arise from at least five different aspects of TD's overdraft practices
which involve different contracts and different contract provisions, as well as different acts by
TD.  *See Dorset Indus., Inc. v. Unified Grocers,* 893 F. Supp. 2d 395, 405 (E.D.N.Y. 2012)
(stating that "a plaintiff may bring two breach of contact claims, one based on breach of the
express terms and the other based on breach of the implied duty, as long as they are supported by
factually distinct allegations") (cites and quotes omitted); *Harsch Props., Inc. v. Nicholas*, 182
Vt. 196, 201-02 (2007) (breach for violation of good faith and fair dealing may form a separate
cause of action than for breach of contract, as long as the counts are based on different conduct);
*Ross v. Canada Life Assurance Co*., 1996 WL 182561 at *7-8 (E.D. Pa. Apr. 16, 1996) (allowing
plaintiffs to pursue claim for breach of good faith as alternative to breach of express contract).
The Second Circuit has held "whether particular conduct violates or is consistent with the duty of
good faith and fair dealing necessarily depends upon the facts of the particular case, and is
ordinarily a question of fact to be determined by the jury."  *Tractebel Energy Marketing, Inc. v.
AEP Power Marketing, Inc*., 487 F.3d 89, 99 (2d Cir. 2007) (cites and quotes omitted).

to carry out its duties in good faith, pursuant to the purpose of the contract between the parties. For example, the assessment of overdraft fees based on anything but the customer's balance of actual funds is not permitted under the covenant of good faith and fair dealing.  *Id.*

TD relies upon *Hassler v. Sovereign Bank,* 644 F. Supp. 2d 509 (D.N.J. 2009), *aff'd* 374 Fed. App'x 341 (3d Cir. 2010), for the proposition that a claim for breach of good faith cannot stand where the contract permits the alleged wrongful fee (*see* Motion, pp. 28-29); however, *Hassler* has been undermined by the more recent New Jersey decision in *Hughes v. TD Bank*.  In *Hughes,* similar to the instant case, TD Bank sought dismissal of a breach of the covenant of good faith and fair dealing based on *Hassler*.  856 F. Supp. 2d at 681.  The District Court rejected TD's argument regarding *Hassler* and instead reasoned that customers stated a claim against TD for breach of good faith, even though the Bank's practice of charging excessive overdraft fees did not violate an express contract term.  *Id.*  The court also stated that "'[v]arious courts have stated that a party must exercise discretion reasonably and with proper motive when that party is vested with the exercise of discretion under a contract.'"  *Id.* (cites omitted).

Plaintiffs do not contend that TD had the discretion to assess overdraft fees on bank-authorized debit card transactions or even to allow excessive fees to be generated through manipulating transaction records and charging fees where no overdrafts actually occurred.  Plaintiffs also do not contend that TD could never assess overdraft fees on debit card transactions, or even increase such fees by posting high-to-low.  But Plaintiffs do contend that TD could not implement the scheme as it did, in breach of its own form contract and the duty to act in good faith and deal fairly with Plaintiffs and the putative class members.

To the extent that TD is arguing that it had the discretion to take such actions (a point which Plaintiffs do not concede), *Hughes* demonstrates that discretion under the contract will not

28

eliminate a cause of action for good faith and fair dealing because the Bank is still under a duty to exercise such discretion fairly and reasonably. The actions alleged in the CAC breached the contract because TD acted solely to maximize fees through its overdraft policies and practices. *See* CAC ¶¶ 199-204. TD violated Plaintiffs' reasonable expectations under the contract. At minimum, the determination of whether there has been a breach is a question of fact for the jury which cannot be determined at this stage. Accordingly, the motion should be denied with respect to the breach of the implied covenant of good faith and fair dealing.

 3. **Plaintiffs State a Valid Claim for Unjust Enrichment.** Plaintiffs' claim for unjust enrichment should be allowed to proceed at this early stage. *E.g.*, *King*, 26 F. Supp. 3d at 519 ("the court agrees with Plaintiffs and declines to dismiss Plaintiffs' unjust enrichment claim at this stage of the litigation"); *Hughes*, 856 F. Supp. 2d at 682 (denying previous attempt by TD Bank to dismiss unjust enrichment claim in overdraft litigation case); *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1321 ("8(d) allows pleading in the alternative, even if the theories are inconsistent. Defendants have not conceded that Plaintiffs are entitled to recovery under the contract, and it is possible that if their contractual claim fails, Plaintiffs may still be entitled to recovery under an unjust enrichment theory"); *Arvest Bank*, 2015 WL 1456186, at *19 (denying motion to dismiss unjust enrichment claim in overdraft fee case, holding "plaintiffs have sufficiently alleged a claim for unjust enrichment as an alternative claim for relief"). The law of the relevant states is in accord. *E.g., Chase Home Fin., LLC v. Risher*, 746 S.E.2d 471, 476 (S.C. Ct. App. 2013); *Regions Bank v. Wingard Props., Inc.*, 715 S.E.2d 348, 356 (S.C. Ct. App. 2011); *MLEA, Inc. v. Atlantic Recycled Rubber, Inc.,* 2005 WL 1217190, at *4 (E.D. Pa. May 19, 2005) (allowing an unjust enrichment claim to proceed in the alternative to a breach of contract claim); *Auguston v. Spry*, 282 A.D.2d 489, 491, 723 N.Y.S.2d 103, 106

(2001) ("the causes of action alleging breach of contract and unjust enrichment may be pleaded alternatively"); *Vidiaki, LLC v. Just Breakfast & Things!!!*, 33 A.3d 848, 862 (Conn. Ct. App. 2012) ("plaintiff is correct in its assertion that it is entitled to plead various alternatives in its complaint, even when those assertions are contradictory").

    **4.**    **Plaintiffs Have a Valid Claim for Conversion.**  To state a claim for conversion, a plaintiff must show: (i) his ownership of *or* right to possess the property,[11] and (ii) a wrongful interference with that right.  *See Moore v. Weinberg*, 644 S.E.2d 740, 749 (S.C. Ct. App. 2007); *Law of Torts* § 15 (5th ed. 1984).  The allegations in the CAC are more than sufficient to satisfy these elements.  First, as established by the plain language of the account agreements at issue, Plaintiffs hold the requisite possessory or ownership rights to the funds in their accounts.  *See* TD Agreement, p. 3 ("ACCOUNT OWNERSHIP – The following provisions explain the rules applicable to *your Account* . . .") (emphasis added); Carolina First Account Agreement, p. 1 ("TERMS AND CONDITIONS OF *YOUR ACCOUNT*") (emphasis added).  Second, by taking monies from these customer-owned accounts to cover fees that were not allowed by contract, Plaintiffs have alleged sufficient facts to show TD's conversion of funds in Plaintiffs' accounts.  *E.g.*, CAC ¶¶ 1-7, 13, 16, 17, 88, 126, 138, 163-64, 248-49, 251.

    In both *King* and *Hughes*, TD had similar attempts to dismiss claims for conversion rejected.  In *King*, Judge Cain held Plaintiffs had properly alleged conversion.  26 F. Supp. 3d at

---

[11] Courts recognizing ownership or possession include: **Conn.**, *Devitt v. Manulik*, 410 A.2d 465, 467 (Conn. 1979); **Fla.**, *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 33 So.2d 858, 860 (Fla. 1948); **Md.**, *Baltimore & Ohio R.R. v. Equitable Bank*, 550 A.2d 407, 410 (Md. Ct. Spec. App. 1988); **Mass.**, *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993); **N.J.**, *Elijah Mount v. Executors of W.W. Cubberly,* 19 N.J.L. 124, 124-25 (1842); **N.Y.**, *Pierpoint v. Doing Business under the Firm Name of Prince & Whitely*, 182 N.E. 235, 236 (N.Y. 1932); **Penn.**, *Scranton Times, L.P. v. Wilkes-Barre Publ'g Co.*, 2009 WL 3100963, at *8 (M.D. Pa. Sept. 23, 2009); **S.C.**, *Channelbind Int'l Corp. v. Esselte Corp.*, 2009 WL 3617611, at *7 (D.S.C. Oct. 29, 2009).

518-19.  In *Hughes*, the court dealt with the issue in great detail.  856 F. Supp. 2d at 682.  TD provides no sound reason to depart from these prior decisions at the motion to dismiss stage. *Also In re Checking Account*, 694 F. Supp. 2d at 1323; *White*, 563 F. Supp. 2d at 1371.

Defendant's cited cases deal with different scenarios, generally where funds were taken from an existing balance, not where improper fees were seized immediately from funds deposited by the customer.  Pursuant to the TD Bank Agreement and Carolina First Agreement, the improperly assessed overdraft fees are due immediately and are taken from any funds intended for the customer account.  *See* Carolina First Agreement, p. 1; TD Agreement, p. 14.

5.     **Unconscionability.**  Plaintiffs believe that they have stated a valid claim for unconscionability based on the arguments previously advanced in the briefing on the motion to dismiss in *King*.  While there is ample authority to support allowing Plaintiffs' claim for unconscionability to go forward – *e.g.*, *Arvest Bank*, 2015 WL 1456186, at *15-18; *Hughes*, 856 F. Supp. 2d at 681; *In re Checking Account Overdraft Litig.*, 694 F. Supp. 2d at 1318-19 – given Judge Cain's prior decision to dismiss the claim, Plaintiffs are willing to accept that ruling for the purposes of TD's latest motion to dismiss.

6.     **Plaintiffs State Valid Claims for Unfair Trade Practices.**  TD's attacks on Plaintiffs' state consumer protection statutory claims also fail.  Dropping a citation to a statute or case here or there, TD treats the state consumer protection act claims *en masse* with generalized arguments that are not universally applicable.  Contrary to TD's assertion – Motion, p. 37 – the CAC recites detailed allegations of the ways in which TD's debit card overdraft practices are unfair, unconscionable, misleading, and deceptive.[12]

---

[12] Plaintiffs hereby agree to dismiss claims under the consumer protection statutes of Massachusetts, Pennsylvania, and Vermont and do not address those arguments herein.

31

As explained previously, Plaintiffs sufficiently allege that TD's practice of using "available balance" to determine if an account is overdrawn is inconsistent with its contractual obligations. TD's implementation of such a practice was not only contradictory to the terms of the PDAA, but was misleading, deceptive, and unconscionable. The CAC sufficiently alleges that TD "intentionally deceived its customers", "fail[ed] to accurately and truthfully describe this overdraft practice", "misrepresent[ed] in th[e] agreements what it actually does", "conceal[ed] this overdraft practice", and that the practice "in conjunction with [TD's] misrepresentations in the account agreements and concealing of material information in the statements and online tools, results in additional and consequential overdraft fees." CAC ¶¶ 117-20. The CAC alleges that TD's contracts "are ambiguous, deceptive, unfair, and misleading to any extent they allowed [TD] to perpetrate the grossly improper acts described in the complaint." *Id*. at ¶ 208. The CAC also alleges that TD "fail[s] to provide an accurate accounting of its overdraft fee assessments in customer account statements . . . and omits information necessary to: (i) identify which transaction is connected to a particular overdraft fee, and (ii) reveal its off-ledger 'available balance' calculations at the time of each purported overdraft." *Id*. at ¶¶ 177, 187(g).

The CAC offers far more detail than Federal Rule 8(a) requires, enough for TD to understand precisely which of its acts and practices Plaintiffs allege were unlawful and caused them to suffer injury. Considering all the allegations, the CAC states unfair or deceptive trade practices act claims upon which relief can be granted, and thus these claims should survive.

a. **TD'S Overdraft Practices Were Not Authorized by Law.**

As discussed above, TD grossly overstates the preemptive force of federal and state banking law and regulation, and it deploys additional straw men in aid of its position. Contrary to Defendant's argument, Plaintiffs do not contend (1) that banks may not allow overdrafts or

assess overdraft fees; or (2) that banks may not charge overdraft fees; or (3) that banks have no general authorization to choose transaction posting order in demand accounts. *See* Motion, p. 38. Defendant fails to address Plaintiffs' entire point: A banking license is not a license to harvest "fees" from unwitting customers' accounts. Federal or state authorization to assess fees on overdrafts does not mean that TD can conduct itself in violation of other state laws.

The consumer fraud and unfair business practices statutes relied upon by Plaintiffs are general in their application. No federal or state law or regulation immunizes TD from laws prohibiting unfair, deceptive, or unconscionable practices such as are alleged in the CAC. In *Gutierrez*, the Ninth Circuit held that California's prohibition against making misleading statements was ***not preempted***. Citing to an OCC publication, the court held that the bank's position was "conclusively undercut by the OCC itself, which . . . 'caution[ed] banks that they may be subject to such laws that prohibit unfair or deceptive acts or practices.'" (quoting *Martinez v. Wells Fargo Home Mort., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010)). According to the Ninth Circuit, "[t]he OCC recognizes that state laws that withstand preemption 'typically do not regulate the manner or content of the business of banking . . . but rather establish the legal infrastructure that makes practicable the conduct of that business.'" *Id.* at 726-27 (quoting OCC, "Bank Activities and Operations," 69 Fed. Reg. 1904, 1913 (Jan. 13, 2004)).

Many other courts have, likewise, held state unfair business practices statutes applicable to banking activities such as those alleged in the CAC. *E.g.*, *In re HSBC Bank*, 1 F. Supp. 2d at 45-47; *Trombley*, 715 F. Supp. 2d at 296; *Hollis v. Ameriquest Mort. Co.*, 2009 WL 3030125 (D.N.J. Bankr. Sept. 17, 2009) (federal banking laws do not preempt the N.J. Consumer Fraud Act); *Baldanzi*, 2008 WL 4924987, at *2; *Jefferson v. Chase Home Finance*, 2008 WL 1883484, at *12-14 (N.D. Cal. Apr. 29, 2008); *Great W. Res.*, 2006 WL 626375, at *3-4; *Levin v. HSBC*

*Bank USA, N.A.*, 2012 WL 7964121, at *7-11 (N.Y. Sup. June 26, 2012). As these courts have recognized, the breadth of federal preemption is closely circumscribed to avoid preemption of generally applicable state consumer protection statutes. Unless the state statute directly conflicts with federal banking law in a manner that requires a bank to act in a way prohibited by federal law or that prohibits banks from conducting business authorized by federal laws and regulations, the state law is not preempted. *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 251 (3d Cir. 2008); *Mann v. TD Bank, N.A.*, 2009 WL 3818128, at * 4 (D.N.J. Nov. 12, 2009).

TD incorrectly asserts, with virtually no support, that all of the relevant statutes require a misleading act or practice to state a claim.[13] Motion, p. 38. Even if all of the state laws at issue required a misrepresentation (which they do not), TD's contention that Plaintiffs failed to allege any misrepresentations is plainly wrong, as discussed above. *E.g.,* CAC ¶ 120 (referencing "misrepresentations in the account agreements and concealing of material information in the statements and online tools"). In any event, not every state requires a misrepresentation.

Likewise, Defendant's broad claim that the voluminous CAC is devoid of any allegation of causation is demonstrably false. For instance, Plaintiffs allege that "[a]s a result of Defendant's violations of the Deceptive Trade Practices Acts of the various states prohibiting unfair and deceptive acts and practices, Plaintiffs and members of the proposed Classes have suffered actual damages[.]" CAC ¶ 235. That is only one example of Plaintiffs' allegations of causation throughout the CAC. *See* CAC ¶¶ 20, 22, 24, 26, 28, 30, 32, 34, 36, 38, 40, 42, 44, 46,

---

[13] Defendant misleadingly quotes *Hassler* for the proposition that a business practice must be misleading to be actionable. However, *Hassler* was discussing "consumer fraud," 644 F. Supp. 2d at 514, which is only one of the six different kinds of affirmative acts that can be actionable under the New Jersey statute. *In re Nat'l Credit Mgmt. Group, LLC*, 21 F. Supp. 2d 424, 448-49 (D.N.J. 1998) (unlawful affirmative acts "include: (1) unconscionable commercial practices, (2) deception, (3) fraud, (4) false pretense, (5) false promise, and (6) misrepresentation.").

48, 50, 52, 54, 56, 58, 60, 62, 64, 66, 68, 70, 72, 74, 168-69, 178-79.[14]

TD further asserts that the unfair trade practices statutes all require causation and/or reliance, and that they should be dismissed because the CAC fails to make such allegations. These concepts are not the same. *E.g.*, *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29-30 (2000); *Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 817 (N.J. Super. 2000). The CAC clearly alleges that Plaintiffs were harmed by TD's violation of state consumer protection acts.

Moreover, Defendant misstates the causation requirement. For example, under the SCUTPA, the NJCFA, the New Hampshire Consumer Protection Act ("NHCPA"), N.H. Rev. Stat. Ann. § 358-A:1 *et seq.*, New York General Business Law § 349, and Connecticut's CGSA § 42-110b, Plaintiffs are only required to establish causation between the unlawful conduct and the loss. *Roberts* v. *Cowgill,* 719 A.2d 668, 671-72 (N.J. Super. 1998); N.H. Rev. Stat. Ann. § 358:A-10 (conferring private right of action under NHCPA to "any person injured by another's use" of unfair and deceptive practices); *Mulligan v. Choice Mortg. Corp. USA*, 1998 U.S. Dist. LEXIS 13248, *34 (D.N.H. Aug. 11, 1998) ("plaintiff need not show that he or she actually relied on the deceptive acts or practices, or that 'actual confusion or misunderstanding' resulted," observing that burden to show causation was not "onerous" because they "only [had to show] that their injuries . . . w[ere] a consequence of Choice's unfair and deceptive practices"); *Wright v. Craft*, 372 S.C. 1, 23 (S.C. Ct. App. 2006) (explaining that causation factor under SCUTPA requires showing that "plaintiff suffered monetary or property loss as a result of the defendant's unfair or deceptive act(s)"); *Stutman*, 95 N.Y.2d at 29-30 ("reliance is not an element of a Section 349 claim"); *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 815-16 (Conn. 1981).

---

[14] Defendant makes the conclusory assertion at pp. 41-42 that "plaintiffs are generally required to allege either reliance or causation," but the brief fails to address New Hampshire, Delaware, and South Carolina law in this regard. Because Defendant bears the burden on this motion to dismiss, the Court should reject Defendant's unsupported position as to these state statutes.

### b.    Plaintiffs Have a Claim Under New Jersey's Consumer Fraud Act.

The New Jersey Consumer Fraud Act ("NJCFA") provides that:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise[15] or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2.  The statute "'specifies the conduct that will amount to an unlawful practice in the disjunctive . . . [and p]roof of any one of those acts or omissions . . . will be sufficient to establish unlawful conduct under the Act.'"  *D'Agostino v. Maldonado*, 78 A.3d 527, 536 (N.J. 2013) (quoting *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994)).

The NJCFA "requires a plaintiff to prove three elements: 1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss."  *D'Agostino*, 78 A.2d at 537.  The statute encompasses "three broad categories of unlawful conduct: affirmative acts; knowing omissions; and regulatory violations."  *Mickens v. Ford Motor Co.*, 900 F. Supp. 2d 427, 436 (D.N.J. 2012).  The CAC here principally alleges affirmative acts.[16]  "One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive."  *Gennari*, 691 A.2d at 365.  "A practice can be unlawful [under the NJCFA] even if no person was in fact misled or deceived thereby.  *The capacity to mislead is the prime ingredient* of all types of consumer fraud."  *Cox v. Sears Roebuck Co.*, 647 A.2d 454, 462 (N.J.

---

[15] The term "merchandise" includes services.  N.J.S.A. 56:8-1(c).

[16] The CAC does allege omissions with respect to account statements and "available balances" at the time of transactions.  With respect to state consumer protection statutes, these omissions are relevant, but TD does not attempt to differentiate omissions from misleading statements.  Suffice it to say, the CAC alleges knowing omissions of material facts.  *E.g.*, CAC ¶¶ 177, 187.

1994) (emphasis added).  Therefore, "'[a] plaintiff need not even show reliance on the violation of the Act as long as an ascertainable loss resulting from defendant's conduct is demonstrated.'" *Id.* (quoting *Leon v. Rite Aid Corp.*, 774 A.2d 674, 677 (N.J. App. Div. 2001)).

As shown above, the CAC's detailed allegations of misrepresentations satisfy the NJCFA's requirement that Plaintiffs plead an unlawful act.  These allegations are more than sufficient for a finding that Defendant's misrepresentations could have misled an ordinary consumer (and that its omissions further caused injury to Plaintiffs by increasing the likelihood of overdrafts and making it more difficult to trace them).  That, alone, establishes unlawful conduct under the NJCFA.  As for the second element of a NJCFA claim – ascertainable loss – Defendant does not (and could not plausibly) contest this.  For purposes of the NJCFA, an ascertainable loss simply "means that plaintiff must suffer a definite, certain and measurable loss, rather than one that is merely theoretical."  *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009). Plaintiffs suffered losses that can readily be ascertained from TD's own records.

The third and final element of a NJCFA claim is causation.  There must be some nexus or causal link between the alleged unlawful act and the ascertainable loss.  Here, the link is directly and clearly alleged in the CAC.  Defendant published misleading or deceptive statements in its account agreements, and subsequently engaged in a programmatic harvesting of overdraft fees from its customers' accounts, causing them to suffer ascertainable losses.  *Roberts*, 719 A.2d at 671-72 ("a causal relationship must exist between the ascertainable loss and the unlawful practice").  Under the NJCFA, Plaintiffs need not have relied upon or been induced by those misleading statements (*i.e.*, there need be no proof of 'transaction causation'), nor need TD have intended to mislead or even knew the PDAA's language was misleading.  Because TD's subsequent performance itself violated the NJCFA, *Weiss*, 482 F.3d at 267, it is sufficient that it

made those misstatements in its customer account materials and subsequently assessed overdraft fees in a manner contrary to the terms of the PDAA. *See Mann v. TD Bank, N.A.*, 2010 WL 4226526, * 7-8 (Oct. 20, 2010) (where TD imposed gift card fees in manner inconsistent with disclosures, and fees resulted in decreased value of gift cards, plaintiffs were entitled to causal presumption that ascertainable loss was caused by the misleading disclosures).

As set forth above, the CAC adequately alleges violations of the NJCFA.

### c. The CAC States a Claim Under Connecticut Law.

The Connecticut unfair trade practices statute prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[17] CGSA § 42-110b. Under the statute, "[a]ny person who suffers an ascertainable loss of money or property, real or personal, as the result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . ." CGSA § 42-110g. A plaintiff states a claim under the Connecticut statute by alleging "that he (1) suffered an ascertainable loss of money or property, (2) that was caused by, (3) an unfair method of competition or an unfair or deceptive act in the conduct of any trade or commerce." *Edwards v. N. Am. Power and Gas, LLC,* 2015 WL 4644597, at *6 (D. Conn. Aug. 4, 2015). Whether conduct is unfair is determined by considering "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, is it within at least the penumbra of some common law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive or unscrupulous; (3) whether it causes substantial injury to

---

[17] TD argues that it is exempt from enforcement of the state's unfair trade practices statute. Motion, p. 38 (citing C.G.S.A. § 42-110c(a)(1)). However, that provision only exempts conduct that is "otherwise permitted" under other laws and regulations. As noted above, TD's actions here were not "permitted" by any law or regulation. Therefore, the exemption is inapplicable.

consumers, [competitors or other businesspersons]." *Edwards*, 2015 WL 4644597, at *6 (quoting *Naples v. Keystone Bldg. & Dev. Corp.,* 990 A.2d 326, 336-37 (Conn. 2010) (citation and internal quotation marks omitted)). Violations of the statute can consist of "'an actual deceptive practice . . . or a practice amounting to a violation of public policy.'" *Miller v. Guimaraes*, 829 A. 2d 422, 434 (Conn. App. 2003).

As set forth above, the CAC alleges that TD's violation of state unfair trade acts and practices statutes resulted in or caused harm to certain of the Plaintiffs and the class members in the form of additional overdraft fees. The statute is remedial, and it is to be construed in favor of its intended beneficiaries – consumers. *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 814 (Conn. 1981). Reliance does not have to be proven. *Id.* at 815-16. Plaintiffs have alleged all that is necessary to state a claim under the Connecticut Unfair Trade Practices Act.

### d.    The CAC States a Claim Under New York Law.

Section 349 of the New York General Business Law provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." To state a Section 349 claim, a plaintiff must allege "(1) that the act, practice or advertisement was consumer-oriented; (2) that the act, practice or advertisement was misleading in a material respect, and (3) that the plaintiff was injured as a result of the deceptive practice, act or advertisement." *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512, 525 (S.D.N.Y. 2003). Because the purpose is to be highly protective, the test "'is not whether it is deceptive to the hypothetical reasonable person, but to the ignorant, the unthinking and the credulous who, in making purchases, do not stop to analyze but are governed by appearances and general impressions.'" *DeAngelis v. Timberpeg E., Inc.* 51 A.D.3d 1175, 1178 (N.Y. App. Div. 2008)) (cites omitted). The CAC alleges that, among other things, TD

"intentionally deceived its customers", "fail[ed] to accurately and truthfully describe this overdraft practice", "misrepresent[ed] in th[e] agreements what it actually does", "conceal[ed] this overdraft practice", which caused Plaintiffs to suffer injury in the form of excessive fees. (CAC ¶¶ 178, 190, 234-35). "[R]eliance is not an element of a Section 349 claim." *Stutman*, 95 N.Y.2d at 29-30 ("Reliance and causation are twin concepts, but they are not identical . . . plaintiffs allege that defendant's material deception caused them to suffer a $275 loss. This allegation satisfies the causation requirement."). The CAC states a claim under New York law.

### e.    The CAC States Claims Under Other State Statutes.

Defendant's attempt to pick off Plaintiffs' claims under various state statutes prohibiting unfair and deceptive acts and practices fails for the following reasons.

**Delaware.**    TD challenges Plaintiffs' claims under the Delaware Deceptive Trade Practices Act ("DTPA"), 6 Del. Code. Ann. § 2531 *et seq.*, on the basis of standing. *See* Motion, p. 40. However, Delaware case law clearly provides that consumers like Plaintiffs have standing under the DTPA. In *Roberts v. Am. Warranty Corp.*, 514 A.2d 1132, 1133 (Del. Super. Ct. 1986), the court rejected defendant's argument that the DTPA "does not apply to a claim made by a consumer" such as the plaintiff who was an automobile buyer. The court rightly noted that the plain language of the DTPA neither limits its protection to businesses nor supports a restrictive construction of the statute. *Id.* Moreover, "[i]t cannot be accepted that the legislature intended to prevent various deceptions of the public but intended not to permit a remedy to be exercised by the deceived members of the public." *Id.* Thus, the court held that "those who are damaged by violation of § 2531 may seek damages for that violation whether they engage in trade or are members of the consuming public." *Id.* at 1134. *See also Norman German's Things to Wear, Inc. v. Mercedes-Benz of N. Am., Inc.*, 558 A.2d 1066 (Del. Super. Ct. 1989), *aff'd*, 596

A.2d 1358 (1991) (holding that consumers have standing under the DTPA).

In *Edwards v. William H. Porter, Inc.*, 1991 Del. Super. LEXIS 315, at *19 (Del. Super. Ct. July 26, 1991), the court acknowledged the existence of contradictory case law regarding whether individual consumers have standing under the DTPA. After a thorough analysis of the statute's legislative history, the court held that since the DTPA "is consumer protection legislation to be liberally construed, it is only fair to recognize that an individual consumer has a private cause of action under the statute." *Id.* at *21-24. Defendant's argument here is identical to those rejected in *Roberts*, *Norman*, and *Edwards*, and should be rejected for the same reasons.

**South Carolina.** Defendant contends that Plaintiffs' claims under the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10 *et seq.*, should be dismissed because the state statute bars class actions.[18] *See* Motion, p. 41. This argument directly contradicts *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 399-406 (2010), which involved a New York statute precluding class actions. There, the Supreme Court held that when a case is pending in federal court, Federal Rule of Civil Procedure 23 governs whether a class action may be maintained, not state law. *Id.* at 399 ("Rule 23 provides a one-size-fits-all formula for deciding the class-action question"). "Rule 23 unambiguously authorizes *any* plaintiff, in *any* federal civil proceeding, to maintain a class action if the Rule's prerequisites are met. We cannot contort its text, even to avert a collision with state law that might render it invalid." *Id.* at 406 (emphasis in original). In rejecting the defendant's forum shopping argument, the Supreme Court noted that "Congress itself has created the possibility that the same case may follow a different course if filed in federal instead of state court." *Id.* at 416.

---

[18] Defendant also argues at page 38 that it is exempt from enforcement of the SCUTPA. As the plain language of that statute makes clear, however, the exemption only applies to "[a]ctions or transactions *permitted* under" other laws or regulations. (emphasis added). The Complaint alleges impermissible actions, with respect to which Defendant is not exempt.

Courts have relied on *Shady Grove* to permit class actions under the SCUTPA in multidistrict litigations such as this one. *See In re Optical Disk Drive Antitrust Litig.*, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (denying motion to dismiss class actions claims under South Carolina law "notwithstanding a limitation on class actions in the state statute" based on *Shady Grove*); *In re Auto. Parts Antitrust Litig.*, 2013 U.S. Dist. LEXIS 80338, *106 (E.D. Mich. June 6, 2013) (relying on *Shady Grove*, the court rejected dismissal based on South Carolina's class prohibition under § 39-5-140). Thus, in accordance with *Shady Grove*, the Court should deny Defendant's motion to dismiss Plaintiffs' claims under the SCUTPA.[19]

**Maryland and North Carolina.** TD challenges claims under these states' statutes based on Plaintiffs' purported failure to assert reliance. In each case, however, Plaintiffs have made sufficient allegations of reliance to move forward. CAC ¶¶ 111, 114, 119-20, 178-80.

Maryland's Consumer Protection Act "is to be construed liberally to promote the protection of consumers." *Scull v. Groover, Christie & Merritt, P.C.*, 76 A.3d 1186, 1193 (Md. 2013) (citing Md. Code §§13-105, 13-102(3)). "The gravamen . . . is whether the false or misleading statements or representations have 'the capacity, tendency, or effect of deceiving or misleading consumers.'" *MRA Prop. Mgmt., Inc. v. Armstrong,* 43 A.3d 397, 413 (Md. 2012) (quoting Md. Code §13-301–(2)(i)) (cites omitted). A violation does not require that a "consumer actually have been misled or damaged." *Id.* (citing Md. Code 13-302). Allegations as to the circumstances surrounding a transaction have been held sufficient without reliance on an overt misrepresentation. In *Gott v. Phillips*, 517 A.2d 328 (Md. 1986), the court found that leasing an unlicensed dwelling unit constituted a violation despite the lack of an explicit statement that a proper license had been obtained because "such a basic prerequisite to any lease

---

[19] In the event the Court agrees that a class action cannot proceed under the SCUTPA, the Court should at minimum permit Plaintiffs to proceed in their individual capacities.

42

agreement is implied." *Also Peckey v. Bank of Am., N.A.*, 2015 U.S. Dist. LEXIS 47210, at *17-18 (D. Md. Apr. 10, 2015) (violations actionable "whether or not any consumer in fact has been misled, deceived, or damaged"). Plaintiffs have met this standard.

In North Carolina, a *prima facie* case for unfair trade practices requires: 1) the commission of an unfair or deceptive act or practice; 2) affecting commerce; 3) that proximately caused injury. *Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001). Reliance under the North Carolina statute is only required when the claim is based on a misrepresentation. *Bumpers v. Community Bank of N. Va.*, 747 S.E.2d 220, 226 (N.C. 2013).[20] In any event, the statute proscribes not only deceptive, but also unfair, acts and practices. For example, in *Richardson v. Bank of America, N.A.,* 643 S.E.2d 410, 424-26 (N.C. Ct. App. 2007), the court concluded that the bank's sale of unapproved credit insurance to consumers was an unfair trade practice under North Carolina law. *Also Gray v. N.C. Ins. Underwriting Ass'n,* 529 S.E. 2d 676, 681 (N.C. 2000). Plaintiffs' allegations are sufficient to state a claim under North Carolina law.

### C.     Plaintiffs State a Valid Usury Claim Under Section 85 of the NBA.

This case involves two very distinct aspects of how TD administers the overdraft process. The first encompasses the initial overdraft for which an administrative fee is charged. The second concerns a so-called "sustained overdraft fee." That term refers to an additional charge the Bank places on overdrawn accounts when the overdraft amount has not been repaid within a certain period of time. This portion of the memorandum deals exclusively with the second charge. As explained below, the distinction between the two charges is critical. The initial fee is purely administrative in nature and so long as the law is followed, the charge is permitted. The

---

[20] Reliance can also be proven circumstantially, and "proof of circumstances from which the jury may reasonably infer the fact is sufficient in proving the element of reliance." *Rikos v. Procter & Gamble Co.,* 2015 WL 4978712, at *15 (6th Cir. Aug. 20, 2015) (quoting *Rowan Cnty. Bd. of Educ.. v. U.S. Gypsum Co.,* 428 S..E. 2d 648, 665 (N.C. 1992)).

second charge, however, is not an administrative fee.  It represents an amount a customer must pay for the use of money over time.  Such an amount charged is defined as "interest" regardless of what term the Bank uses.  And interest is subject to usury laws.

Here is how TD works its sustained overdraft charges:  If Customer "A" were to overdraft his account by $100 in a single transaction, TD initially would charge an overdraft fee of $35.00 for that transaction.  If Customer "A" does not replenish his or her account to bring the balance to a positive figure within ten days, then TD deducts yet another $20.00 from the account of Customer "A" for having extended this credit.  This second charge is based solely on the debt to the Bank remaining unpaid by the customer *for a period of time*.  As with a normal loan, the so-called fee, or "interest," is generated by computer based upon the passage of time.  Plaintiffs will show that the charges imposed as sustained overdraft fees are usurious and illegal.

The analysis begins with TD's PDDA which addresses sustained overdrafts on page 14:

**Sustained Fee for Overdrawn Accounts**

We may charge you a fee, as disclosed on the Personal Fee Schedule, for any Checking or Money Market Account that remains in overdrawn status for ten (10) consecutive Business Days.  We will notify you if your Checking or Money Market Account is in overdrawn status.  *If your Checking or Money Market Account is in overdrawn status because of an overdraft, check returned for insufficient funds or for any other reason and the Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.*  If you have overdraft protection and you have exceeded your limit and the Check or Money Market Account remains in overdrawn status for ten (10) consecutive Business Days, we may charge the fee.

If the Checking or Money Market Account remains in overdrawn status for sixty (60) Calendar Days, or such earlier time that we determine that the overdraft balance is uncollectable, the Bank will close and place the Checking or Money Market Account in collection status.

*See* CAC, Ex. A, p. 14 (emphasis added).

As this provision says, TD charges an additional fee against any checking account based solely on the time the account remains in overdraft status.  Note the relevant allegations in

paragraphs 248 through 251 of the CAC:

248. . . . Such extensions of credit are de facto loans made without a specific loan agreement. In fact, 12 U.S.C. § 84 defines the term "loans and extensions of credit" as including any and all direct or indirect advances of funds to a person made on the basis of any obligation of that person to repay the funds.

249. . . . TD Bank has knowingly charged and collected "sustained" overdraft fees from Plaintiffs and others similarly situated that far exceeded this permissible rate.

250. For example, using the maximum amount of Plaintiff Robinson's overdraft during the relevant period ($439.42) and applying a 6.25% annual interest rate over a 10-day period, the maximum amount that TD Bank was legally permitted to charge Plaintiff Robinson was only 76¢. Instead, TD Bank charged her $20.00 for that 10-day period – which is over 26 times the maximum legal amount.

251. A charge of $20.00 for a 10-day period on Plaintiff Robinson's negative balance (which fluctuated from $147.10 to $439.42) translates to an effective annualized interest rate of between 166 percent and 496 percent.

In an effort to avoid the regulations on interest rates, TD Bank throws all charges relating to NSF items, both initial fees and time based charges, into a single pot of administrative charges. This is financial sleight-of-hand and frankly it is disingenuous considering that in its home base of Canada (*see* "Company History" http://www.tdbank.com/aboutus/company_history.html) the Bank recognizes it for what it is. TD acknowledges the charges as interest.[21] The Bank seems to believe that by calling it a flat fee in America, it can exceed usury laws. The flat fee does not camouflage what it really is – a time-based charge which is universally accepted as interest.

---

[21] TD Bank Canada also calls it "overdraft interest." TD defines and characterizes overdraft interest as follows:

Overdraft Interest is applied to your account for any time throughout the month when you are overdrawn, regardless of whether or not you have Overdraft Protection. (Once the overdraft is paid, the interest stops accruing.)

Overdraft Interest is not included in the fee for Overdraft Protection, and is charged at a rate of 21% per annum.

(found on Aug. 28, 2015 at http://td.intelliresponse.com/accounts/?requestType=NormalRequest&source=3&id=243&question=What+is+Overdraft+Interest).

In its motion to dismiss, TD attempts to justify its actions by distorting most rules and regulations, and ignores others entirely.  Adding to the confusion TD seeks to create, it cites inapplicable case law.  TD starts by focusing on 12 C.F.R. §7.4001 and §7.4002, then proceeds to twist the context of what those provisions say.  In fact, the cited regulations support Plaintiffs' position, not that of TD.  The proper step-by-step analysis goes like this:  Step one centers on the definition of "interest" appearing in 12 CFR § 7.4001(a), which implements the NBA.  It specifically includes "late fees" within the definition:

> (a) *Definition.* The term "interest" as used in 12 U.S.C. 85 includes any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. *It includes*, among other things, the following fees connected with credit extension or availability: numerical periodic rates, *late fees…*

*See* 12 CFR § 7.4001(a) (emphasis added).  The sustained overdraft fee falls squarely within that definition of interest under 12 C.F.R. § 7.4001 *and* the NBA.

Step two of the analysis reveals that while 12 C.F.R. § 7.4002 addresses service-based charges, subparagraph (c) of that provision explicitly prohibits the application of § 7.4002 where a bank charge falls within the definition of interest under § 7.4001.  The regulation states: "charges and fees that are *interest* within the meaning of [the NBA] are governed by 7.4001 and not by this section."  *See* 12 C.F.R. § 7.4002(c) (emphasis added).  In § 7.4001 there is no definition section.  However, "extension of credit" is plainly defined in Regulation O, in which a key provision explains that "extension of credit" specifically includes overdraft advances:

> § 215.3   Extension of Credit.

> (a)       An extension of credit is a making or renewal of any loan, a granting of a line of credit, or an extending of credit in any manner whatsoever, and includes:
> ***
> (2)     *An advance by means of an overdraft*, cash item, or otherwise; …

*See* 12 C.F.R. § 215 (emphasis added). Although this definition appears in the section addressing extensions of credit to insiders of a bank, it is an integral part of the entire framework of the regulations, and understanding all of them is vital to grasping regulatory intent. The regulation is designed to ensure that insiders are treated in the same manner as all other persons who are not insiders and not employed by the bank. 12 C.F.R. § 215.4(a).

Step three gives further context to the analysis by looking at certain federal banking administrative provisions promulgated by the Federal Deposit Insurance Corporation (FDIC) and the Federal Financial Institutions Examination Council (FFIEC). Based upon §1817(a)(1) of the Federal Deposit Insurance Act, the FDIC is responsible for collecting a quarterly financial statement referred to as the "Report of Condition and Income" from its insured financial institutions. This quarterly report contains statements of a bank's income, assets, liabilities, and write-offs for bad debt. It constitutes a major method used by regulatory agencies to monitor banks. Reports of Condition and Income are a widely used source of timely and accurate financial data regarding a bank's condition and the results of its operations. The appendix attached to this memorandum shows the applicable FFIEC regulations. *See* Appendix B (Ex. 8 hereto). Relevant provisions are highlighted to illustrate that *extensions of credit are to be reported as loans*. (RC-C-1). Overdrafts, including "unplanned overdrafts" fall within the category of *"all other loans."* (RC-C-19). *"Interest income"* includes charges levied against overdrawn accounts *based on the length of time the account has been overdrawn, the magnitude of the overdrawn balance, or which are otherwise equivalent to interest."* (RI-2 and 3). "Loans" take on many forms, including "overdrafts." (A-54). And *"any overdraft, whether planned or unplanned, is an extension of credit and is to be treated and reported as a 'loan' rather than being treated as a negative deposit balance."* (A-64).

Besides ignoring the full scope of applicable regulations and rules, TD resorts to twisting decisions in an effort to make its case. For example, TD relies on *Cargile v. JP Morgan Chase & Co.*, 2010 WL 5491200 (E.D. Mich. 2010), and tries to create the impression that it involved the same type of fee at issue here. Though there is a fleeting reference to "insufficient funds fees and extended overdraft fees totaling $852.00, in amount ranging from $25.00 to $35.00 per check," *Cargile* makes clear that the only type of fees being addressed by the court was *initial* overdraft fees. In fact, the deposit agreement quoted in *Cargile* showed that negative balances were subject to interest. Customers were alerted that they would be responsible not only for an overdraft fee *but also for "accrued interest" on the "amount of the overdraft."*

Another decision relied upon by TD is *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041 (S.D. Fla. 1988), but that case too dealt only with initial overdraft fees and the plaintiff's claim that the fee constituted interest. Noting that there is nothing in the NBA expressly defining "interest," the court in *Video Trax* looked to Black's Law Dictionary for ordinary meaning.

> Interest has been understood to include *any compensation allowed by law or fixed by the parties for the use or forbearance of money*, or the price which is fixed for the use of money. The common definition of "interest rate" has been held to be the "percentage of an amount of money which is paid *for its use for a specified time*."

*Id*. at 1049-50 (emphasis added). The court held only that an *initial* overdraft fee does not fall within this definition. Notably, however, a passage in *Video Trax* shows that the bank charged a "fee" when an overdraft was created and then charged "interest" on the overdraft balance:

> As evidenced by the account agreement, Plaintiff agreed in writing to pay a flat fee when a check presented to Defendant for payment exceeded the collected balance in Plaintiff's account. *In addition, Defendant charged interest on overdraft sums to the extent those sums exceeded collected balances in Plaintiff's account. The rate of interest charged was Defendant's prime rate plus 3%, and was subject to the maximum rate permissible by law. Id*. at 1044-45. (Emphasis added)

As revealed in the court's comment in *Video Trax*, the charge on outstanding sums occasioned by the overdrafts is distinguishable from the initial service fee. In fact those charges are interest

48

because they compensate TD solely for the customer's use of advanced funds measured by time. *See First Dakota Nat'l Bank v. First Nat'l Bank of Plainview*, 2011 WL 4382147, *7 (D.S.D. 2011) ("It is the Court's conclusion that the repeated overdrafts and negative balances covered by [the bank] were the equivalent of unsecured loans"); *also State v. Mullin*, 225 N.W. 2d 305, 308 (Iowa 1975) (an overdraft is "an extension of credit to the customer"); *In re Frigitemp Corp.*, 34 B.R. 1000, 1019-20 (S.D.N.Y. 1983) (overdrafts are "short-term extensions of credit" for which banks "have customarily charged interest").[22]

TD conveniently ignores the distinction noted above in *Video Trax* between administrative charges and interest on extended credit over time. TD's Motion string cites several cases for the proposition that "insufficient funds fees arising from a deposit agreement are not interest under the NBA." In all but one instance, however, the cited cases only address *initial* NSF charges just like *Cargile* and *Video Trax*. *Armstrong v. Colonial Bank, N.A.*, 196 Fed. App'x 872 (11th Cir. 2006); *Soto v. Bank of Lancaster County*, 2010 WL 1257666 (E.D. Pa. Mar. 30, 2010); *In re Wash. Mut. Overdraft Prot. Litig.*, 2004 WL 5046210 (C.D. Cal. Apr. 26, 2004); *Terrell v. Hancock Bank*, 7 F. Supp. 2d 812, 816 (S.D. Miss. 1998); *Nicolas v. Deposit Guaranty Nat'l Bank*, 182 F.R.D. 226, 231 (S.D. Miss. 1998).

In the lone sustained overdraft case of *McGee v. Bank of America, N.A.*, 2015 U.S. Dist. LEXIS 99626 (S.D. Fla. July 30, 2015), the court mistakenly relied on *Video Trax* and made no distinction between the initial NSF fee and the charges associated with the use of funds over time. To make its case, however, TD uses *Video Trax* as a building block in support of *McGee*,

---

[22] To the extent TD relies on an isolated passage in *Video Trax* for the proposition that overdrafts are not "extensions of credit," such reliance is unavailing. *Video Trax* was decided 1988 and did not take into account current banking regulations discussed above such as Regulation O. Moreover, as noted, the entire analysis in *Video Trax* was focused on the "service" nature of initial overdraft fees and did not deal with time-triggered charges.

and in the process extracts from *Video Trax* a blanket rule that a sustained fee cannot be interest without an underlying "extension of credit." Once again, however, *Video Trax* related only to the *initial* overdraft fee, and did not extend to sustained fees which accrue over time.

The point is that TD treats the situation exactly like an extension of credit when it applies a time based charge in the form of the sustained fee. Otherwise put, labels placed on the credit extensions do not change what really exists – use of money over time triggering payment obligations. No matter what TD Bank calls the charge for a sustained overdraft or how it pigeonholes it on financial statements, there is a time honored test applied by many courts that reveals its true identity. "If it walks like a duck, quacks like a duck and looks like a duck, then it's a duck." *See BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F. 3d 1322, 1336 (11th Cir. 1998). The sustained overdraft fee is interest and must be limited to amounts allowable by law.[23]

## V.    **Conclusion.**

For the second time, this Court should deny TD's Motion to Dismiss.

---

[23] If the Court were to give credence to any of TD's points raised by TD, at the very least factual issues have been raised and Plaintiffs should be entitled to pursue discovery. Moreover, TD argues that the sustained overdraft fee is subject to the "non-interest charges" provision of 12 C.F.R. § 7.4002. The clear terms of that regulation raise fact questions that could only be resolved with the benefit of discovery such as whether the Bank established the charge in accordance with safe and sound banking principles; whether the Bank had a decision-making process for establishing the sustained fee and what it actually was; whether the Bank actually considered the listed factors when establishing the sustained overdraft fee, and so forth. TD's own authorities highlight that evidence would be needed on such points. For example, in *Nicolas*, after quoting 12 C.F.R. § 7.4002, the court noted that the bank "has provided sufficient evidence, unrefuted by [plaintiff], showing that the NSF fee substantially satisfies the above reasonableness factors." And in *Terrell*, the court said that the fees at issue satisfied the reasonableness factors set forth in 12 C.F.R. § 7.4002. Dismissal would therefore be improper. *Cf. Synovus Bank v. Griner*, 739 S.E. 2d 504 (Ga. App. 2013) (denying motion to dismiss usury suit based on overdraft fees on basis that discovery was needed; observing that "charge must be shown to be based upon some service rendered . . . other than the advance of money" and that "a transaction that involves an extension of credit and charge that is based on a time value of money calculation generally will fall under the usury statue unless a statutory exception exists").

DATED this 2nd day of September, 2015.

Respectfully submitted by,

/s/ Mark C. Tanenbaum
Mark C. Tanenbaum
**LAW OFFICE OF MARK C. TANENBAUM**
120 Church Street
Charleston, SC 29413
Telephone: (843) 577-5100
mark@tanenbaumlaw.com

/s/ William E. Hopkins, Jr.
William E. Hopkins, Jr.
**HOPKINS LAW FIRM, LLC**
12019 Ocean Highway
Pawleys Island, SC 29585
Telephone: (843) 314-4202
bill@hopkinslawfirm.com

*Liaison Counsel for Plaintiffs*

/s/ E. Adam Webb
E. Adam Webb
**WEBB, KLASE & LEMOND, LLC**
1900 The Exchange, SE, Suite 480
Atlanta, GA 30339
Telephone: (770) 444-0773
Adam@WebbLLC.com

/s/ Richard D. McCune
Richard D. McCune
**McCUNEWRIGHT LLP**
2068 Orange Tree Lane, Suite 216
Redlands, CA 92374
Telephone: (909) 557-1250
rdm@mccunewright.com

*Co-Lead Counsel for Plaintiffs*

Richard M. Golomb
**GOLOMB & HONIK, P.C.**
1515 Market Street, Suite 1100
Philadelphia, PA 19102
Telephone: (215) 985-9177
rgolomb@golombhonik.com

Hassan A. Zavareei
**TYCKO & ZAVAREEI LLP**
2000 L Street, N.W., Suite 808
Washington, D.C. 20036
Telephone: (202) 973-0900
hzavareei@tzlegal.com

Joseph C. Kohn
**KOHN, SWIFT & GRAF, P.C.**
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com

Francis J. "Casey" Flynn, Jr.
**CAREY, DANIS & LOWE**
8235 Forsyth Boulevard, Suite 1100
Saint Louis, MO 63105
Telephone: (800) 721-2519
francisflynn@careydanis.com

John R. Hargrove
**HARGROVE PIERSON & BROWN, P.A.**
21 SE 5th Street, Suite 200
Boca Raton, FL 33432
Telephone: (561) 300-3900
JRH@HargroveLawGroup.com

*Plaintiffs' Executive Committee*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 2, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a true and correct copy to be served via e-mail on all ECF-registered counsel of record.

*/s/ E. Adam Webb*
E. Adam Webb